UNITED JEWISH ORGANIZATIONS OF WILLIAMSBURGH, INC., et al., Plaintiffs-Appellants,

v.

Malcolm WILSON, Governor of the State of New York, et al., Defendants-Appellees,

N.A.A.C.P. et al., Intervenors-Appellees.

No. 1251, Docket 74–2037.

United States Court of Appeals, Second Circuit.

Argued Aug. 16, 1974.

Decided Jan. 6, 1975.

---

Nathan Lewin, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., Dennis Rapps, Brooklyn,

N. Y., of counsel), for plaintiffs-appellants.

George D. Zuckerman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, of counsel), for defendants-appellees Wilson, Ghezzi, Anderson and Duryea.

Gerald W. Jones, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty. for the Eastern District of New York, J. Stanley Pottinger, Asst. Atty. Gen., Walter Gorman and S. Michael Scadron, Attys., Dept. of Justice, Washington, D. C., of counsel), for defendant-appellee Saxbe.

Irwin L. Herzog, Asst. Corp. Counsel for the City of New York, New York City, for defendant-appellee The Board of Elections of the City of New York.

Eric Schnapper, New York City (Jack Greenberg, New York City, of counsel), for intervenors-appellees.

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

OAKES, Circuit Judge:

■ This appeal brings us close to full circle in respect to reapportionment—all the way back from Baker v. Carr almost to Colegrove v. Green. It poses the subtle question whether a federal court should interfere to invalidate on fourteenth or fifteenth amendment grounds a state legislative districting plan for two counties specifically drawn to ensure nonwhite voters a "viable majority" or a "realistic opportunity for minorities to elect a candidate of their choice"[1] in state senatorial and assembly districts. The question is made no less complex by virtue of its being brought by a group of Jewish organizations and individuals, speaking for the *Hasidic* community in the Williamsburg section of Brooklyn, New York, but addressing themselves to the effect of the districting upon them *qua* white voters as well as *qua* members of the *Hasidic* community. Further added to this recipe for judicial perplexity is the fact that the districting scheme was enacted after disapproval of a prior districting by the Attorney General of the United States (hereinafter "the Attorney General") on the basis of the State's abridgement of the right of nonwhites to vote, such objection operating to forbid utilization of the prior districting by virtue of the applicability of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 et seq., to New York's Bronx, Kings and New York Counties. The district court dismissed the complaint, holding that the plaintiffs had suffered no cognizable injury and that "racial considerations" had been permissibly employed in the later districting "to correct a wrong." We affirm, for reasons that differ somewhat.[2] A histo-

---

\* Of the Southern District of New York and the Central District of California, respectively, sitting by designation.

1. These are the words of a Memorandum of Decision, Nos. V6541–47, at 15, 18, of the United States Department of Justice attached to a letter of the Assistant Attorney General of the United States, approving the 1974 districting here in issue.

2. Because the statutes in question are not of statewide applicability, a three-judge court is not required. 28 U.S.C. § 2281. Board of Regents of the University of Texas System v. New Left Education Project, 404 U.S. 541, 542–543, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). Even though the statutes involve the State legislature, they relate only to Kings and New York Counties (plaintiffs seek relief only in Kings County) and are therefore solely of local impact. Ince v. Rockefeller, 290 F.Supp. 878, 882 (S.D.N.Y.1968). Although the Supreme Court did hear an appeal in Wright v.

Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), involving a constitutional challenge to four congressional districts in one county in New York, which was brought before and heard by a three-judge district court, the Court did not discuss the basis of its jurisdiction. Nor did any of the three opinions below in Wright v. Rockefeller, 211 F.Supp. 460 (S.D.N.Y.1962), explain why convening the three-judge court was necessary. Even if the Court were sub silentio approving the propriety of three-judge courts hearing cases of purely local impact, such approval has been overruled by the more recent Board of Regents v. New Left Education Project, *supra,* and cases cited therein. *See also* Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

While originally there was a claim under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, which would have required a three-judge court under Allen v. State Board of

ry of the controversy must be set forth to crystallize the issues.

## FACTS

We commence with July 31, 1970, when the Attorney General of the United States filed with the Federal Register his determination that New York on November 1, 1968, maintained a test or device (a literacy test) as defined in Section 4(c) of the Voting Rights Act as amended, 42 U.S.C. § 1973b. 35 Fed. Reg.12354. Then on March 27, 1971, the United States Bureau of the Census also determined that Bronx, Kings and New York Counties were subject to Sections 4 and 5 of the Voting Rights Act, 42 U.S.C. §§ 1973b[3] and 1973c,[4] since a lit-

---

Elections, 393 U.S. 544, 562–563, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), that claim was dismissed by the district court and is not made here.

3. 42 U.S.C. § 1973b:

(a) To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of ten years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this subchapter, determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff.

An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

If the Attorney General determines that he has no reason to believe that any such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment.

(b) The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964. On and after August 6, 1970, in addition to any State or political subdivision of a State determined to be subject to subsection (a) of this section pursuant to the previous sentence, the provisions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968.

A determination or certification of the Attorney General or of the Director of the Census under this section or under section 1973d or 1973k of this title shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

(c) The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

. . . . .

4. 42 U.S.C. § 1973c:

Whenever a State or political subdivision with respect to which the prohibitions set

eracy test was used in those counties prior to 1970 and less than 50 per cent of the voting age residents voted in the presidential election of 1968. 36 Fed. Reg.5809 (1971). The State of New York filed a complaint on December 3, 1971, in the United States District Court for the District of Columbia for a declaratory judgment exempting the three affected counties under § 4(a) of the Act, 42 U.S.C. § 1973b(a). This judgment was granted with Justice Department consent on April 13, 1972. New York State v. United States, Civil No. 2419–71 (D.D.C.) (unreported). The NAACP unsuccessfully appealed to the United States Supreme Court the denial of its leave to intervene in the District of Columbia case, NAACP v. New York, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973), but on remand its motion was granted. After District Judge Stewart's decision granting a preliminary injunction in Torres v. Sachs, 381 F.Supp. 309 (S.D.N.Y.1973) (failure to provide Spanish translation of ballot contravened Voting Rights Act), the intervenor NAACP successfully reopened the declaratory judgment action and obtained two orders from the District of Columbia District Court, one on January 10, 1974, directing the State on behalf of the three counties

to comply with the filing requirements of § 5 of the Act, 42 U.S.C. § 1973c, and the second on April 30, 1974, granting the NAACP's motion for summary judgment. Those orders were summarily affirmed the other day by the United States Supreme Court. New York v. United States, 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974).

We then return to 1972 when, in January, the State of New York altered the Senate and Assembly lines in Kings County in view of population changes evident in the 1970 census. Laws of New York (1972) Ch. 11. Under that reapportionment, the *Hasidic* community was included within the 57th State Assembly District and the 17th State Senate District. As a result of the January 10, 1974, decision of the District of Columbia District Court, however, New York was required to obtain and on January 31, 1974, did seek approval of the Attorney General under Section 5 of the Voting Rights Act as to the 1972 redistricting in Bronx, Kings and New York Counties. This is because a legislative reapportionment is a change of "standard, practice, or procedure with respect to voting" within § 5 of the Act, 42 U.S.C. § 1973c. Georgia v. United States, 411 U.S. 526, 93 S.Ct. 1702, 36

forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of

race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

L.Ed.2d 472 (1973). On April 1, 1974, the Assistant Attorney General in charge of the Civil Rights Division, J. Stanley Pottinger, advised the New York Attorney General's office that while the majority of the 1972 redistricting was unobjectionable "we cannot conclude . . . that those portions [relating to certain districts in Kings and New York Counties] of these redistricting plans will not have the effect of abridging the right to vote on account of race or color" by virtue of overly concentrating minority populations in certain senate and assembly districts while "diffusing" the remaining minority population adjoining those districts into a number of other districts. Thus, *it is because New York had failed to comply with the Voting Rights Act in the first instance* (by way of having a "device" with fewer than 50 per cent voting) *that it fell afoul of that Act and was in a position* (for which it will remain for ten years under § 4(a), 42 U.S.C. § 1973b(a)) *where its districting is subject to disapproval of the Attorney General* if, for example, its proposed lines are drawn so as to deny or abridge the rights of minority citizens to vote. Even though the State defendants here disavow the determination of the Attorney General of April 1,[5] that determination was *not* appealed by the State of New York, its sole appellate remedy being by way of action in a three-judge District Court for the District of Columbia under § 5 of the Act, 42 U.S.C. § 1973c. Thus we can say unequivocally that the State of New York was in a position where it *had* to obtain Department of Justice approval of *new* district lines before it could hold a proper election under the Voting Rights Act.

The State proceeded to draw new lines and to obtain such approval and it is those lines which are under attack here. The New York Joint Legislative Committee on Reapportionment met, under the gun so to speak,[6] to draw lines and prepare a series of laws which were enacted in special session on May 29 and 30, 1974. Laws of New York (1974) Chs. 588, 589, 590, 591 and 599. These lines were drawn, Richard S. Scolaro, the executive director of the Joint Committee on Reapportionment testified below, to comply with Justice Department criteria,[7] informally discussed over the telephone and in person, that there be three senate and two assembly districts with "substantial nonwhite majorities." Because the assembly district in which the entire *Hasidic* community was located under the 1972 apportionment had a nonwhite population of 61.5 per cent and the Justice Department indicated this was insufficient, Mr. Scolaro "got the feeling," although the number was not specifically referred to, that a 65 per cent nonwhite majority would be approved. Under the 1974 reapportionment plan devised and approved the *Hasidic* community was divided almost in half, placed in Assembly Districts 56 and 57 and Senate Districts 23 and 25. Assembly District 56 as redrawn contains

---

5. That determination was that

However, on the basis of all the available demographic facts and comments received on these submissions as well as the state's legal burden of proving that the submitted plans have neither the purpose nor the effect of abridging the right to vote because of race or color, we have concluded that the proscribed effect may exist in parts of the plans in Kings and New York Counties. (Ex. VI, attached to complaint.)

6. The "gun" did not just consist of the Attorney General's directive effectively outlawing portions of the 1972 reapportionment, thereby throwing orderly primary and general elections of 1974 into disarray. There was also a pending three-judge district court action brought by the NAACP to compel the State to enact new district lines in compliance with the Department of Justice's order. NAACP v. New York City Board of Elections, 72 Civ. 1460 (S.D.N.Y.).

7. Section 1 of Laws of New York (1974) Ch. 588 reads as follows:

Section 1. This act shall be known as the "Reapportionment Compliance Act of nineteen hundred seventy-four", and its purposes are to effectuate compliance with the determination of the United States Department of Justice dated April first, nineteen hundred seventy-four, and to comply with sections four and five of the Voting Rights Act of nineteen hundred sixty-five insofar as applicable.

(Footnote omitted.)

88.1 per cent nonwhite population, Assembly District 57 contains 65.0 per cent nonwhite population, Senate District 23 contains 71.1 per cent nonwhite population, Senate District 25 contains 34.7 per cent nonwhite population. Interim Report of the Joint Committee on Reapportionment, Albany, New York, May 27, 1974, at A29–A30.[8] This litigation ensued on June 11, 1974, and a TRO was denied below.

On July 1, 1974, the Attorney General approved the 1974 districting here under attack in a 22-page letter covering the scope of his review; the public awareness and comment, in the absence of public hearings, of the reapportionment issue; the intent and purpose of the Voting Rights Act (said, along with the fifteenth amendment, "to have been primarily to eliminate discrimination against Negroes" but also to protect "Puerto Ricans in New York," pp. 9-10); and consideration of the respective computations of voters by race in certain of the redrawn districts. That consideration, it may be pointed out, involved analysis that of Kings County as a whole 64.9 per cent of the population was white, 24.7 per cent black and 10.4 per cent Puerto Rican, and that the issues raised by the plaintiff-appellants here "are not ones which the Attorney General has authority to determine under the provisions of

Section 5 of the Voting Rights Act" (p. 19).

The court below denied plaintiffs' motions for a preliminary injunction and for summary judgment and dismissed the complaint below on July 25, 1974. Appeal was filed and this court heard a motion to expedite the appeal on the first motion day thereafter, August 13, 1974, granted the motion, heard the appeal on August 16, 1974, with extensive and skillful briefs, and a week later, per curiam, affirmed the district court's denial of a preliminary injunction.[9]

## CONTENTIONS OF THE PARTIES

Plaintiffs' complaint sought in addition to a general prayer (1) injunctive relief against the administration and implementation of the 1974 redistricting laws by the defendant Governor and other state officials and New York City Board of Elections[10] (the "state appellees"); (2) a judgment against the Attorney General declaring that the standard under which he rejected the 1972 laws was unconstitutional; (3) declaratory and injunctive relief against the 1974 laws; and (4) injunctive relief against implementation of any redistricting other than that of 1972 or alternatively that established by the Judicial Commission appointed by the New York Court of Appeals.[11] Plaintiffs as appellants here

---

8. According to the Interim Report of the Joint Committee on Reapportionment, Albany, New York, May 27, 1974, the net result of the 1974 reapportionment was to produce out of the 22 assembly districts involved, five districts having a nonwhite population of over 75 per cent and two additional districts of over 65 per cent. *Id.* at 8. Previously there had been six over 60 per cent nonwhite and one over 50 per cent nonwhite, of which five were represented by nonwhites. *Id.* at 7.

9. Affirmance ensued because appellants had presented to the district court very little probability of success on the merits and the electoral process was well along. Even though the complaint was filed on June 11, 1974, the first day for signing designating petitions for the primary was June 17 and the last day was July 15. N.Y. Election Law § 149–a (McKinney's Consol.Laws, c. 17, Supp.1974). By the time this court heard the case, despite its extraordinary expedition, there were only 25 days to the primary. Laws of New York (1974) Ch. 9.

10. The complaint referred to dilution of the plaintiffs' right to vote for the United States Congress but that was dropped in the early stages of the appeal. The fact that the *Hasidic* community is not divided in the congressional district probably explains this. We note that the NAACP urges that this indicates that the real complaint of appellants is *qua Hasidim*, not *qua* white voter.

11. In WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964), the Court held that New York's apportionment scheme violated the fourteenth amendment owing to the population disparities between districts. In In re Orans, 15 N.Y.2d 339, 258 N.Y.S.2d 825, 206 N.E.2d 854 (1965), the New York Court of Appeals construed the New York Constitution and established a Judicial Commission to draw up an apportionment plan which was approved in In re Orans, 17 N.Y.2d 107, 269 N.Y.S.2d 97, 216 N.E.2d 311 (1966).

essentially argue that because the 1974 redistricting was done under a formula drawn on a racial basis, they have been divided between districts so that their voting power is minimized and diluted, and that inherently suspect racial criteria have been used to create invidious restrictions against them both as members of the *Hasidic* community and as white voters. Particular attack is directed toward what appellants characterize as the Department of Justice's "approach" that "the best way to achieve equality for minorities . . . is to elect more black, Puerto Rican, Indian or Chicano executives and legislators" (Appellants' brief at 22), and that the only way to reach this goal is to maximize, but not waste, minority populations in each electoral district so that a comfortable majority will offset the lower percentage of nonwhites actually voting. The three principal flaws in the Department's "approach" are said to be (1) the assumption that race is the principal determination of choice by voters; (2) the notion that a high percentage of blacks in a district constitutes "undue concentration" and a lower percentage amounts to "substantial diffusion," because by virtue of the nature of a regional election-district system, districts will vary depending on residential patterns; and (3) the assumption that only black or minority-race legislators can represent black or minority-race interests.[12]

The State appellees argue that there is no constitutional prohibition against cutting across city, county or "community" lines and, as Judge Bruchhausen held, that utilization of racial considerations is not unconstitutional when it is overcoming, as here, a racially discriminatory effect, the unlawful 1972 reapportionment.[13] The Attorney General argues that the court below is without jurisdiction to review his determination under

Section 5 of the Voting Rights Act; that the appellants have no standing to seek that review; and that the constitution and Voting Rights Act do not guarantee individuals who represent a religious or ethnic community districts which maintain community unity. Finally, the NAACP argues, first, that appellants lack standing under the Voting Rights Act and because there is no connection between the alleged injury to appellants and the alleged defects in the 1974 lines, and, second, that the 1974 reapportionment laws are constitutional.

## DISCUSSION

A. Section 5 of the Voting Rights Act Is Not a Bar Except as to Relief Against the Attorney General.

We deal first with the question whether, as the Attorney General and NAACP contend, Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, bars this suit. We hold that it does not.

Section 5 specifically states that "neither the Attorney General's failure to object [to e. g., a reapportionment plan] nor a declaratory judgment [of the District Court for the District of Columbia] entered under this section shall bar a subsequent action to enjoin enforcement of" statutes such as are here under attack. Note 4 *supra*. Even though a state is in compliance with the Act (either by Attorney General approval or district court declaratory judgment), "private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5." Allen v. State Board of Elections, 393 U.S. 544, 549–550, 89 S.Ct. 817, 823, 22 L.Ed.2d 1 (1969). This is a "traditional suit" even if it raises novel contentions. Jurisdiction lies under 28 U.S.C. §§ 1331, 1343 and 1357 to vindicate claims under the fourteenth and fif-

---

12. By not discussing these supposed "flaws" we do not imply that we agree with appellants' characterization of the Justice Department's "approach."

13. Although the outcome of this litigation does not turn on whether the 1972 districting was

ever effectuated, its lines were used in the 1972 primary and general elections. Thereafter the District of Columbia District Court found that the counties in question were not exempt from the Voting Rights Act.

teenth amendments. The Voting Rights Act in no way appears to outlaw a citizen's suit to enjoin a districting statute, such as was involved in, e. g., Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), whether or not the state of which he is a citizen is under the hopefully benign aegis of the Voting Rights Act.[14]

The court below does not, however, have jurisdiction to "review" the Attorney General's determination of April 1, 1974, disapproving the 1972 Act, that jurisdiction being vested exclusively in the District Court for the District of Columbia, in a suit apparently only at the instance of the State or a political subdivision,[15] Allen v. State Board of Elections, 393 U.S. at 555, 561, 89 S.Ct. 817. In such a suit the appellants might have had the option of intervening by timely motion at the discretion of the district court. See NAACP v. New York, 413 U.S. at 364–369, 93 S.Ct. 2591. Since no such suit was filed, to the extent that the appellants seek such review, to which their second specific prayer for relief (as well as some of the language of their otherwise most ingenious brief) was addressed, the court below had no power to

give it. Since that is the only relief sought against the Attorney General, dismissal of the complaint against him was warranted.[16] The rest of the case must be treated as involving only relief sought against the State appellees.

**B. Standing to Sue State Officials.**

■ A more difficult question is whether appellants have standing either as representing the *Hasidic* community or as white voters to seek relief against the State appellees. We hold that they do not as *Hasidim* but do as white voters.

As representatives of the *Hasidic* community, appellants present a very appealing case. They properly point with pride to their closely knit community as consisting of a "substantially self-sustaining and totally law-abiding" group, which came to the Williamsburgh area as survivors of the Nazi Holocaust, lives scrupulously observant of distinctive religious practices, and—despite their initial skepticism of democracy—participates actively in civic affairs including the electoral process. As a result of the 1974 laws that community, which had been in one state senate and one state assembly district, has been divided in two and its strength as a voting bloc diluted accordingly. But similar claims

---

14. The last sentence of § 5 of the Act, note 4 *supra*, does require that "[a]ny action under this section" shall be determined by a three-judge court. That reference includes "subsequent actions to enjoin enforcement" brought by an individual as well as an action by "a State or political subdivision" in the United States District Court for the District of Columbia. Allen v. State Board of Elections, 393 U.S. at 561–562, 89 S.Ct. 817. Thus insofar as this suit was originally brought *under* § 5 of the Voting Rights Act, it was required to be heard by a three-judge court; the NAACP suit, note 6 *supra*, was just such a suit. But *this* suit, as *now* maintained, is not a suit under the Voting Rights Act but a suit solely under the fourteenth and fifteenth amendments. As such it is governed by the general three-judge court statute, inapplicable here, note 2 *supra*, not § 5. We do not interpret the last sentence of Part I of the Supreme Court's opinion in NAACP v. New York, 413 U.S. 345, 352, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973), to the contrary.

15. Indeed, a lawsuit was instituted directly in the District of Columbia District Court by some individual assemblymen from Kings County when New York's Attorney General decided not to sue on behalf of the State to overturn the April 1, 1974, order. This suit was summarily dismissed for lack of standing. Griffith v. United States, Civil No. 74–648 (D.D.C. May 3, 1974). This clearly seems proper under Allen v. State Board of Elections, 393 U.S. at 561, 89 S.Ct. 817.

16. Appellants do not urge that a Voting Rights Act determination of the Attorney General is reviewable under the Administrative Procedure Act, probably because they concede it to be "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Analogous determinations under § 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, have been held not subject to judicial review. United States v. Greenwood Municipal Separate School Districts, 406 F.2d 1086 (5th Cir. 1969).

for community recognition have been rejected in the past. As was said by a three-judge court in respect to divisions of certain Brooklyn communities in Wells v. Rockefeller, 281 F.Supp. 821, 825 (S.D.N.Y.1968), rev'd on other grounds, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969):

> The Legislature cannot be expected to satisfy, by its redistricting action, the personal political ambitions or the district preferences of all our citizens. For everyone on the wrong side of the line, there may well be his counterpart on the right side. . . . [E]ven Brooklyn's large population will not support twenty community congressmen. Of necessity, there must be lines which divide.

See also Ince v. Rockefeller, 290 F.Supp. 878 (S.D.N.Y.1968) (claim of black residents of East Elmhurst, Queens County, that their community was divided between two assembly districts with racial motivation, dismissed by single judge). There can be no claim to being left together in one district at least absent a showing of discrimination on grounds of race or color against the residents of the "community" operating so as to deprive them of the right to vote, e. g., in municipal elections, Gomillion v. Lightfoot, supra (state gerrymandering removed 395 or 396 out of 400 Negro voters from City of Tuskeegee boundaries) or, perhaps, operating so as purposefully to diminish the effectiveness of their vote through various districting plans. See Douglas, J., dissenting in Wright v. Rockefeller, 376 U.S. at 61, 84 S.Ct. 603; Klahr v. Williams, 339 F.Supp. 922, 927 (D.Ariz. 1972) (three-judge court). There are from 20 to 60 clearly-defined communities in Kings County, but only 8.6 senate districts and 21.4 assembly districts. To preserve community political integrity and comply with Reynolds v. Sims, 377

U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), would therefore be impossible.[17]

Here, more to the point, the appellants do not *claim* that the purpose of the 1974 districting was to *dilute* or *abridge* the *Hasidic* vote. Rather their complaint is that the purpose was to ensure nonwhite majority representation in the districts in question. Their argument that this purpose was unconstitutional is unchanged whether the *Hasidim* were included in one district or two. While it is true that the appellants may be quarrelling with the Attorney General's apparent viewpoint that the Voting Rights Act does not empower him to consider ethnic as opposed to color discriminations in a submission under the Act, a view which we do not necessarily share, it is a far cry from this to say that a state *must* in a reapportionment draw lines so as to preserve ethnic community unity. Any holding otherwise would, it seems to us, make reapportionment an impossible task for any legislature. Whether our decision on this point is cast on the merits or as a matter of standing is probably immaterial. *See also* Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932).

We turn then to whether appellants have standing to assert their claims as *white voters* that racial considerations cannot be used in drawing district lines in any manner, a claim which is grounded both upon the equal protection clause, i. e., that *white* voters are denied equal protection, and the fifteenth amendment, i. e., that *white* voters' rights are abridged on account of race or color. There is no reason, as we see it, that a white voter may not have standing, just as a nonwhite voter, to allege a denial of equal protection as well as an abridgement of his right to vote on account of race or color, *see* 1 B. Schwartz, Statuto-

17. Under N.Y.Const., Art. III §§ 4, 5 (McKinney 1969), "blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants." Applying this "block on the border" requirement, seven new assembly districts in Kings County have a population of exactly 120,768 and the new senate districts vary by only one person. *See* Interim Report of the Joint Legislative Committee on Reapportionment (hereinafter cited as Interim Report), App. K and M.

ry History of the United States: Civil Rights (1970) 181–333, 367–428, regardless of the fact that the fourteenth and fifteenth amendments were adopted for the purpose of ensuring equal protection to the black person. While we generally tend to think of white voters as being in the majority because in the country as a whole and in most states they are, it is plain enough that in a given state or political subdivision they may not be; to the extent that the fourteenth and fifteenth amendments can be construed as extending the rights of *minority* groups, in a given situation that group may of course be white. Thus, previous cases affording standing to black voters making claims of denial of equal protection or denial or abridgement of vote are equally applicable here. *Cf.* Gomillion v. Lightfoot, *supra* (deciding claim on merits); Wright v. Rockefeller, *supra* (same). *See also* Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

The intervenor-appellee NAACP argues that appellants lack standing because there is no connection between their alleged injury, defined by the intervenor as community dispersal, and the alleged constitutional defect in the 1974 districting, that is, consideration of a 65 percent nonwhite racial criteria.[18] The argument is that it would have been, and there was some evidence that it was, possible to put the entire *Hasidic* community into one assembly district (the 56th) and one senate district (the 25th) and still comply with the supposed 65 per cent requirement. But we read appellants' claim to be broader than simply a claim for community unity. We read them as urging that as *white* voters

their vote has been abridged on account of race or color;[19] it is the community division which may have induced the litigation but it is the allegation of race or rather color consciousness in the districting that is appellants' plaint. We believe there is here a logical nexus between the status asserted by appellants *qua* white voters and this claim. *See* Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Thus we hold they have standing to assert this claim.

### C. The Merits of the Controversy.

The appellants' claim is one that has not only intellectual appeal on the surface but also some support in the language—we do not say rhetoric—of cases which have been brought by nonwhite minority groups. *E. g.*, Douglas, J., dissenting and concurring in Wright v. Rockefeller, 376 U.S. at 59, 66–67, 84 S.Ct. 603. *See also* Judge Feinberg's concurrence in the three-judge district court in Wright v. Rockefeller, 211 F.Supp. 460, 468 (S.D.N.Y.1962), affirmed by the Supreme Court, *supra.* The loss of a vote need not be shown, it is argued; the constitutional vice is constituting lines on a racial (or color) basis. We are referred on the one hand by the appellants to the long line of equal protection cases to the effect that race is always and everywhere a "constitutionally suspect classification," *e. g.*, McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), and on the other hand by appellees and the intervenor to the almost equally long line of cases permitting racial considerations to be used affirmatively to offset past discrimination or as the district court here

---

**18.** To be sure, some of the witnesses for appellants (Rabbis Friedman and Stauber, Mr. Lefkowitz) testified that keeping the *Hasidim* together in one district, regardless of the district's having a *nonwhite* majority, was their only concern. But we do not limit appellants' skillful counsel by the expressed views of some of his witnesses, nor do we read their testimony quite as unambiguously as does the NAACP.

**19.** We read their claim thus, even though they dropped their initial complaint as to the

congressional district (in which they were left intact as a community). This streamlining of the case may have been out of sympathy for the federal judges who had to wrestle with their contentions—like avoiding "confusion to the jury." But whatever appellants' motives are, it would be inappropriate—and too easy—for us to drop a real issue in the case on the basis that we believed appellants' interest was *qua Hasidim*, not *qua* whites.

put it, 377 F.Supp. 1164, 1166, to "correct a wrong"—in education, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); in housing, Otero v. New York City Housing Authority, 484 F.2d 1122, 1132–1134 (2d Cir. 1973); in grand jury selection, Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966), cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967); and in employment, Associated General Contractors v. Altshuler, 490 F.2d 9, 16–19 (1st Cir. 1973), cert. denied, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). However tempting it might be in the abstract to determine whether gerrymandering with race or color in mind may be affirmatively used to offset previous race or color discrimination, that question, analogous perhaps to the question that was argued if not decided in DeFunis v. Odegaard, 42 U.S.L.W. 4578 (U.S. Apr. 23, 1974), we do not think is reached here.

In the first place, there is no showing here that the effect of the New York legislature's drawing the 1974 district lines as it did was invidiously to cancel out or minimize the voting strength of white voters in Kings County. Even considering that the assembly and senate districts here in question would now necessarily elect nonwhite assemblymen and

senators, an assumption we by no means may make,[20] there would be no disproportionately nonwhite representation in either house.[21] Even if there were, that would apparently be insufficient to sustain appellants' claim under the stiffer test of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (Texas multimember districts dissolved), and Whitcomb v. Chavis, 403 U.S. 124, 149–150, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); the burden, *White* says, 412 U.S. at 766, 93 S.Ct. at 2339, is

> to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

Here there is no such evidence; there is no history of official racial discrimination against whites; there is no indication that the white community has ever in fact been the victim of political or other racial discrimination in the districts in question, in Kings County, or in the state of New York as a whole.[22]

Thus, appellants' argument is reduced to the proposition that districting on racial lines is per se unconstitutional.

**20.** Thankfully, we seem more and more coming to the day when the American voters vote *person* or *party* or *issue* and not *color* or *race* or *sex*. Until that idyllic day all voters do this, however, a Voting Rights Act or fifteenth amendment will be necessary.

**21.** The population of Kings County is 64.9 per cent white, 24.7 per cent black and 10.4 per cent Puerto Rican. Memorandum of Decision, United States Dep't of Justice, Nos. V6541–47, July 1, 1974, at 13. For purposes of the Voting Rights Act the Puerto Rican population is considered nonwhite. *Id.* at 10–11. Thus Kings County is 35.1 percent nonwhite. Under the 1972 districting, one out of the ten senate districts contained a substantial nonwhite majority population. Under the amended 1974 plan three of the districts, or 30 per cent, contain substantial nonwhite population majorities—proportionately slightly less minority concentration districts than the percentage of nonwhite voters in the county. Interim Report of the Joint Committee on Reapportionment, *supra* note 8, at 5.

Of the 22 assembly districts in Kings County six had over 60 per cent nonwhite population and one over 50 per cent nonwhite population under the 1972 plan. The 1974 plan created five districts having over 75 per cent nonwhite population and two of over 65 per cent. Thus seven or 31.4 per cent of the districts contain a majority of nonwhite population, again less than the percentage of the nonwhite population in the county. *Id.* at 7–8.

**22.** In Wright v. Rockefeller, 376 U.S. at 58, 84 S.Ct. at 606, the Court, holding that proof of discrimination by race was essential to plaintiffs' challenge of a New York apportionment statute, said:

> We accept the District Court's finding that appellants have not shown that the challenged part of the New York Act was the product of a state *contrivance to segregate* on the basis of race or place of origin. (Emphasis added.) Here there is no allegation of a *contrivance* to segregate.

In deciding this question it is unnecessary to determine whether a legislature, starting afresh, can draw lines on a racial or color basis so as to give proportional representation or equivalent voting strength to whites and nonwhites. This is true even though some authority can be found supporting both sides of such a proposition.[23]

Happily, perhaps, our task is a narrower one than determining the applicability of the *Gaffney* principle, *see* note 23 *supra,* in a racial districting case. Here

**23.** Reynolds v. Sims, 377 U.S. 533, 579–581, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), recognizes that there are considerations such as political boundaries which can be taken into account. *See* Note, Reapportionment, 79 Harv.L.Rev. 1226, 1244–46 (1966). The issue would be whether race can be considered noninvidiously. *See also* Mahan v. Howell, 410 U.S. 315, 325, 93 S.Ct. 979, 985, 35 L.Ed.2d 320 (1973) (Virginia legislature can deviate slightly from equal population to maintain integrity of political subdivisions so long as the deviation is "free from any taint of arbitrariness or discrimination"). Gaffney v. Cummings, 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973), contains some pertinent language. "There are other relevant factors [than mathematical equality among district populations] to be taken into account and other important interests that States may legitimately be mindful of." In *Gaffney* the court held that a

> consciously and overtly adopted and followed . . . policy of "political fairness," which aimed at a rough scheme of proportional representation of the two major political parties.

was constitutional. *Id.* at 738, 93 S.Ct. at 2323. While the Court said that districting is invalid if it *"fences out* a racial group" (Gomillion v. Lightfoot, *supra* note 2) and multimember districting is invalid if it *"cancels out* the voting strength of racial or political elements" (Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965)), *id.* at 751, 93 S.Ct. at 2331, it also said that "[d]istrict lines are rarely neutral phenomena," and that a "politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results," *id.* at 753, 93 S.Ct. at 2332. The Court then said at the time a "neutral" plan is known, its political effect is known and when the plan is passed its effect is therefore "intended." *Id.* The same can obviously be said of racial considerations. The *Gaffney* Court held that as long as groups, political and *racial,* are not "fenced out" and their voting strength "invidiously minimized" (White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)), and as long as population is equal, political considerations are valid:

> But neither we nor the district courts have a constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, *provide a rough sort of proportional representation in the legislative halls* of the State.

*Id.* 379 U.S. at 754, 93 S.Ct. at 2332. (emphasis added).

Since the Court lumps "political and racial" together in its analysis, it could be argued that the same holding applies where a state districting, for whatever reason, gives racial minorities, as here, *proportional* strength. Indeed, "colorblindness" could in a given situation lead to unfair results. *See* Note, Reapportionment on the Sub-State Level of Government: Equal Representation or Equal Vote?, 50 B.U.L.Rev. 231, 252 (1970):

> Strict numerical equality is one constitutional standard, and a plan providing for numerical equality would never be constitutionally abhorrent unless it was proven that the plan was purposely adopted to shut out a specific minority [citing Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965)].

*But see* Whitcomb v. Chavis, 403 U.S. at 149–160, 91 S.Ct. 1858; Howard v. Adams County Board of Supervisors, 453 F.2d 455 (5th Cir. 1972); Kilgarlin v. Martin, 252 F.Supp. 404 (S.D.Tex.1966) (three-judge court), rev'd on other grounds, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Mann v. Davis, 245 F.Supp. 241, 245 (E.D.Va.) (three-judge court), aff'd, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed.2d 35 (1965); Ferrell v. Oklahoma, 339 F.Supp. 73, 83 (W.D.Okl.) (three-judge court), aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972). And *see* Douglas, J., dissenting in Wright v. Rockefeller, 376 U.S. at 66–67, 84 S.Ct. at 611:

> But government has no business designing electoral districts along racial or religious lines. We held in Akins v. Texas, 325 U.S. 398, 403 [65 S.Ct. 1276, 1279, 89 L.Ed. 1692], and in Brown v. Allen, 344 U.S. 443, 471 [73 S.Ct. 397, 414–415, 97 L.Ed. 469], that courts in selecting juries need not—indeed should not—give each jury list the proportional racial composition that the community has. If race is not a proper criterion for drawing a jury list, how can it be in designing an electoral district?

the New York legislature was not "starting afresh"; the State had run afoul of the Voting Rights Act. Thus it was drawing district lines in conformity with standards of the Attorney General of the United States, acting under that Act in a way not subject to challenge here for reasons previously stated. We therefore, need do no more than rely on Allen v. Board of Elections, 393 U.S. at 569, 89 S.Ct. 817, 833, where the Court referred to the companion case heard under the *Allen* name, Fairley v. Patterson, which involved a change from district to at-large voting for county supervisors. The Court said:

> The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot. See Reynolds v. Sims, 377 U.S. 533, 555 [84 S.Ct. 1362, 1378, 12 L.Ed.2d 506] (1964). Voters who are members of a racial minority might well be in the majority in one district, but in a decided minority in the county as a whole. This type of change could therefore nullify their ability to elect the candidate of their choice just as would prohibiting some of them from voting.

■ This type of situation, underrepresentation of race by the districting of *1972* following upon dilution of nonwhite representation through the use of unlawful devices in and prior to 1968, is what *Allen* held the Voting Rights Act was designed to cure. To correct an invidious discrimination in favor of white voters and against nonwhites which had occurred in Kings County, the Attorney General necessarily had to think in racial terms in considering his approval of the 1974 lines. To the extent that approval was sought in advance, and the lines drawn by the legislature so as to obtain the Attorney General's favorable nod, it might be said that the racial result was "intended." *Cf.* Gaffney v. Cummings, 412 U.S. 735, 753, 93 S.Ct. 2321, 37

L.Ed.2d 298 (1973). But this is what the Voting Rights Act contemplated, and *since it necessarily deals with race or color, corrective action under it must do the same.*[24] That the Act was intended to implement the fourteenth and fifteenth amendments and is constitutional, there can be no doubt. South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

■ We hold, therefore, that so long as a districting, even though based on racial considerations, is in conformity with the unchallenged directive of and has the approval of the Attorney General of the United States under the Act, at least absent a clear showing that the resultant legislative reapportionment is unfairly prejudicial to white or nonwhite, that districting is not subject to challenge. Whether this is to say that in the broader sense the controversy is not "justiciable" (which would bring us full circle in this situation to Colgrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946)),[25] or that the appellants' claim lacks merit, we can leave to someone else to determine. Our judgment is that the judgment dismissing the complaint is affirmed. If the appellants have any solace as white voters it is that the application of the Voting Rights Act to New York is limited to a ten year period, as we have pointed out. Section 4(a), 42 U.S.C. § 1973b(a).

Judgment affirmed.

FRANKEL, District Judge (dissenting):

Agreeing that the action is not barred by the Voting Rights Act and that plaintiffs have standing, I would reverse and hold the laws in question unconstitutional.

As perceived by the majority, the bland contention emerging from this "recipe for judicial perplexity" is whether "districting on racial lines is per se

---

**24.** It is probably redundant to reiterate that the appellants cannot obtain review of the Attorney General's action here. *See* A *supra.*

**25.** That is, that determining where district lines should be drawn is a legislative rather than a judicial function. The judiciary's only role is assuring that the determination is not invidious in purpose or effect.

unconstitutional." If that is the question, the dissent now launched is largely beside the point. With deference, however, I believe the court has misplaced the perplexities actually presented by overlooking the critical (and undisputed) facts.

The case is not about whether an awareness of race in drawing district lines is "per se unconstitutional." The case concerns the drawing of district lines with a central and governing premise that a set number of districts must have a predetermined nonwhite majority of 65% or more in order to ensure nonwhite control in those districts. The case is one where no preexisting wrong was shown of such a character as to justify, or render congruent, a presumptively odious concept of a racial "critical mass" as a principle for the fashioning of electoral districts. Indeed, it is a case where no official is willing to accept, let alone to claim, responsibility for the requirement of 65% or over nonwhite. This is the case that compels me to vote for reversal.

I.

Critical facts, though discoverable from the court's opinion, must be highlighted to make the points in this dissent.

When the United States Attorney General reviewed the State's 1972 districting laws, he found them acceptable for the most part. As to "parts of the plans in Kings and New York Counties," however, he found that the State had not met its "burden of proving that the submitted plans have neither the purpose nor the effect of abridging the right to vote because of race or color. . . ." He "concluded that the proscribed effect may exist" in the unapproved parts of the plans. With respect to the Kings County Senate and Assembly plans, which concern us here, he said:

". . . Senate district 18 appears to have an abnormally high minority concentration while adjoining minority neighborhoods are significantly diffused into surrounding districts. In the less populous proposed assembly districts, the minority population appears to be concentrated into districts 53, 54, 55 and 56, while minority neighborhoods adjoining those districts are diffused into a number of other districts. As with the congressional plan we know of no necessity for such configuration and believe other rational alternatives exist."

Neither the Legislature nor the Executive of New York agreed with this appraisal of their legislation. But the pressures of time posed hard choices. June 17 was the first day for signing designating petitions for the primary. N.Y. Election Law § 149–a, subd. 2. The petitions were to be filed with the Board of Elections by July 15. Id., subd. 4. The primary was scheduled for September 10. Laws of 1974, ch. 9.

In the face of this schedule, it was determined that the lines should be redrawn in a fashion that might obviate the Attorney General's objections. The initial work of meeting the objections was undertaken by the Joint Legislative Committee on Reapportionment. Working with the Department of Justice, the Committee's staff acquired the understanding that they must organize two more Senate and two more Assembly districts with substantial nonwhite majorities.

So far as can be told from the record before us, there was no semblance of an effort to take the asserted instances of undue "concentration" and improper "diffusion" and set them to rights by particular and principled revisions. Instead, in an atmosphere of hasty dickering, the Legislative Committee staff proceeded to redraw the lines under a controlling mandate to see that seven Assembly and three Senate districts had nonwhite majorities of 65% or greater. The 65% figure was taken on the explicit premise that anything less (given lower rates of voter registration and turnout) would render uncertain the power of the nonwhite majority to control election results in those districts. The 65% minimum was pressed in total disregard of

whether it might be a necessary or suitable means to correct any improper "concentration" or "diffusion."

While it was never said explicitly (a matter of some consequence for the decision herein), the Committee's staff director "got the feeling" that, to avoid disapproval, the 1972 Assembly district in which the *Hasidic* community was entirely embraced at the time would require revision to raise its nonwhite population from 61.5% to 65%. As he described the exchanges with Department of Justice personnel, the upward revision from 61.5% resulted from conversations and inferences of the following character:

"I said how much higher do you have to go?

"Is 70 percent all right?

"They didn't say yes or no, but they indicated it is more in line with the way we think in order to effect the possibility of a minority candidate being elected within that district.

"I suggested 65 percent. It came out at that time that is a figure used by the NAACP in numerous briefs and other documents.

"I got the feeling, and I cannot vouch for this as a matter of having been specifically said, but I left that meeting indicating that 65 percent would be probably an approved figure."

The upshot of the talks, the director said, was: "I thought it was logical for me to assume anything under 65 would not be acceptable."

Following the "feelings" and assumptions thus derived, the Joint Committee made the district line changes assailed in this case; "block by block and census tract by census tract, [they] colored in in various proportions the Puerto Rican population, and the black population, all over the area." The former district lines were thus revised by adding blocks or sections here and there, subtracting and shifting others, all with an eye single upon the racial composition of the bits

and pieces being moved. The criteria that had been followed in the 1972 enactments—the interests, for example, in communities and natural boundaries— were not directly altered, but were subordinated where necessary to the central objective of racial shifts to achieve seemingly required percentages. Bills embodying these changes were introduced in a special session of the New York State Legislature and enacted on May 29 and 30, 1974. Laws of 1974, chs. 588, 589, 590, 591, and 599. There does not appear to have been any revision by the Legislature of the work, or of the underlying premises, of the Joint Committee.

The new laws were submitted for the Attorney General's approval on May 31, 1974, and declared unobjectionable by him on July 1, 1974. The phrasing of his response is interesting and significant. He said he "does not interpose any objection. . . . " He took pains to spell out at length his disclaimer of responsibility, or even support, for the 65% idea or any other semblance of a racial quota or minimum supposed necessary for effective control.

Far from seeking to justify the racially determined changes of 1974 as essential or proper remedies for anything, the Attorney General assures us that "nothing supports the proposition that the plan upon which the State decided was at the insistence of the United States." [1] That statement in a brief merely reaffirms what was said at greater length when the Department of Justice announced its non-objection to the 1974 redistricting:

"In assessing these arguments [against the 1974 lines], two basic principles should be kept in mind. First, it is not the function or authority of the Attorney General under Section 5 to devise redistricting plans, or for that matter to dictate to the State of New York specific actions, steps or lines with respect to its own redistricting plan. The only function of the Attorney General under Section 5 is to evaluate a voting change, such as that en-

---

1. Brief for Appellee Saxbe, p. 22.

compassed in the instant submission, once it has been adopted by the state and submitted for the Attorney General's review, and to determine the limited question of whether the purpose or effect of the change in question is to deny or abridge the right to vote on account of race or color. If no such abridgment or denial exists, the Attorney General must not object to the plan, regardless of the merits or demerits of the plan in other regards, including state, local, and partisan political ones. If an abridgment or denial does exist—as we found in the first submission by New York—the Attorney General must object, stating his reasons, but not drawing a counter plan or commanding any particular state response." [2]

Not only did the Attorney General pointedly disavow the "function . . . to devise redistricting plans"; he made plain in the same decision his position that concern for the rights of white voters (except perhaps for those with Spanish surnames) was actually no part of his business under the Voting Rights Act. The Civil Rights Division, speaking for him, said:

> "In contrast to the foregoing conclusion regarding Puerto Ricans ['that some Spanish-surnamed Americans are covered by federal statutes which protect the rights of non-white citizens'], there was nothing revealed by our review of the circumstances surrounding the adoption of the Fifteenth Amendment, the passage of the Voting Rights Act and its Amendments, the language of those provisions, their legislative history, or the formula used for bringing states and political subdivisions under the Act which indicates that Hasidic Jews or persons of Irish, Polish or Italian descent are within the scope of the special protections defined by the Congress in the Voting Rights Act. Nor has material supporting that view been brought to our attention by others. We are forced to conclude,

therefore, that given what we now know of relevant precedent, these groups are not among those whose rights the Attorney General is commanded and empowered to protect in his consideration of a submission under Section 5 of the Voting Rights Act. We make no comment, of course, on the relative merits of this congressionally defined scope of coverage and nothing we say here should be interpreted as affecting any other rights accruing to these parties from other sources." [3]

Thus, the problem presented here is one the Attorney General did not even consider. Correctly or not, he deemed it beyond the bounds of his concern to notice whether the rights of white voters might suffer invasion by the districting plans he was asked to review.

## II.

The law governing this case begins with the fundamental proposition that classification by race or ethnic origin is "odious" in our society, Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), to be tolerated, if at all, only for rare and compelling necessities, see Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), and perhaps nowhere more repulsive than in relation to the "right to vote freely . . . [which] is of the essence of a democratic society," Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). The complexities of life have been thought to compel occasional departures, slight always and gingerly, from the rule of governmental color-blindness. But the idea of quotas, deeply suspect anywhere, is likely never to find root, while we preserve our fundamental character as a nation, in the organization of electoral constituencies. The idea of a polity, deliberately organized as a matter of state policy, into districts whose people are proportioned according to whether they are white, black, yellow—and, let

---

**2.** Department of Justice, Civil Rights Division, Memorandum of Decision, July 1, 1974, p. 17.

**3.** *Id.* pp. 11–12.

us not blink, "Hungarians . . ., Poles . . ., Germans . . ., Portuguese . . ., Mexicans [or] the numerous minority groups in New York, and so on through the whole gamut of racial and religious concentrations in various cities", Hughes v. Superior Court, 339 U.S. 460, 464, 70 S.Ct. 718, 721, 94 L.Ed. 985 (1950)—is at war with our bedrock concepts of individual worth and integrity. But that is essentially the concept followed in drawing the districts involved in this case.[4]

The racial quota or 65% minimum employed for districting in this case was held valid in the district court "to correct a wrong" and is sustained again here as "corrective action." There are two defects in this position, each independently sufficient to require reversal:

(1) The attack is upon legislation, but neither the legislature nor any responsible official anywhere purports to have found the racial quota either necessary or even appropriate to correct the supposed wrongs.

(2) Whatever an official could have said, the record before us reveals not even a reasonable basis, let alone a compelling necessity, to justify a scheme of nonwhite control (and white subordination) through a predetermined minimum of 65% per selected district.

(1) Neither the district court nor this court has "found" the 65% rule suited as a remedy for the unsurmounted objections of the Attorney General to the 1972 lines. Nobody else has made such a finding either. But "corrective action," surely not least when it takes the form of racial criteria for legislation, must be related to the evil or disorder to be cured; "the means chosen to implement the compelling interest should be reasonably related to the desired end." Associated General Contractors v. Altshuler, 490 F.2d 9, 18 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); cf. Otero v. New York City Housing Authority, 484 F.2d 1122, 1134 (2d Cir. 1973); McLaughlin v. Florida, 379 U.S. 184, 193, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Brooks v. Beto, 366 F.2d 1, 12 (5th Cir. 1966); United States v. Jefferson County Bd. of Educ., 380 F.2d 385, 390 (5th Cir.), cert. denied sub nom. Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

Far from finding or claiming such a remedial function for the questioned district lines, the authors of the legislation earnestly deny the need for it. The State, as its brief reminds us (p. 3), drew the 1974 lines only "[t]o satisfy the demands of the United States Attorney General. . . ." It did this, the same brief stresses (p. 15), though it "does not believe that the 1972 legislative . . . redistricting statutes produced a racially discriminatory effect as charged by the Department of Justice. . . ."

4. Among the dubieties in this case is the insistent concern for "nonwhite" majorities that embrace both blacks and Puerto Ricans. Whatever inspires the United States Attorney General, a court sitting in New York may notice the artificiality of the merger. It may be true that in our rich, and sometimes bitter, diversities, sundry whites, of various stripes, are frequently at odds with Puerto Ricans. But conflicts between blacks and Puerto Ricans are familiar. See Gaby, "Newark: The Promise of Survival," The Nation, December 14, 1974, at 619, 621. The latter have been heard in the context of this very case to resist being submerged by black majorities or pluralities to make "nonwhite" majorities; they seek instead a Bronx Congressional district in which Puerto Ricans are a majority. "Puerto Rican spokesmen," it was noted by the Department of Justice, complained of one Congressional district containing 53% blacks, 19.2% Puerto Ricans, and a combined "nonwhite majority" of 72.2%. Civil Rights Division, Memorandum of Decision, July 1, 1974, p. 14. Likewise, they assailed another district which had 45.1% black, 18.2% Puerto Rican and a resulting "nonwhite majority" of 63.3%. "They maintain[ed] that the plan [had] the effect of splintering off substantial numbers of Puerto Ricans into [the 2 districts] and that a district could be created in which Puerto Ricans are a majority." Id. If these are not cheerful subjects, they do remind us of the thorns, political as well as constitutional, into which we plunge when we consider racial quotas for voting districts.

As for the Department of Justice, it did, of course, rule as an antecedent of the 1974 redistricting that the State had not met its "burden of proving that the submitted [1972] plans have neither the purpose nor the effect of abridging the right to vote because of race or color."[5] We need not conjure at this time with the question of how far this "failure of proof" may be deemed, in the words of the Intervenors (N.A.A.C.P. and others), a "decision that the 1972 lines were discriminatory."[6] Treating it as such, the critical point remains that the Attorney General of the United States utterly disclaims approval, let alone authority, of the 65% mandate.

Thus, the majority errs, I think, when it says the State Legislature "was drawing district lines in conformity with standards of the Attorney General of the United States. . . ."

In this setting, where nobody professes to have determined that the quota requirement was necessary or proper as a remedy for supposed wrongs, it is erroneous for this or any court to validate the arrangement as "corrective action." This would be so even if, contrary to the view tendered later in this opinion, such a species of remedy might somehow survive constitutional scrutiny. It is clearly true where no one purports to have fashioned the remedy to repair, aptly and carefully, the supposed evil it addressed.

It is not the court's proper business to decide whether we might, as New York legislators, have found persuasive a course of reasoning repudiated by those elected to write the laws of New York. The repudiation is decisive for us. It is at least decisive where no other authority (specifically, the United States Attorney General) with a voice in the matter sustains the "corrective action" premise. Strictly and narrowly speaking, which may be the best way to speak for most constitutional law matters, we are neither required nor entitled to determine

whether the 1974 districting laws might be sustainable upon a foundation the Legislature did not purport even to consider.

Where vital constitutional rights are at stake, asserted statutory invasions are not justifiable by supposed legislative purposes that are not reasonably discoverable from what the legislature has done. Eisenstadt v. Baird, 405 U.S. 438, 447–452, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). A purpose never considered and adopted by the authoritative organs of the state's power cannot supply a "rational basis" (or, of course, any meaningful basis at all) for a state enactment. Sherbert v. Verner, 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); see also Gomillion v. Lightfoot, 364 U.S. 339, 342, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); cf. Cantwell v. Connecticut, 310 U.S. 296, 307–308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). A fortiori, a ground deliberately rejected by the State Legislature cannot sustain a law which, but for that ground, violates the fourteenth and fifteenth amendments.

That is the instant case. There is no authoritative claim that the racial 65% minimum majority applied to create the disputed districts could be justified by compelling need. There is not even an assertion by any responsible official of a rational basis. Because this is so, we should probably end this case by striking down the laws and "remanding" to the New York Legislature for focused, rational, lawful drawing of district lines. Cf. United States v. Bass, 404 U.S. 336, 349–350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); Bickel & Wellington, Legislative Purpose and the Judicial Process, 71 Harv.L.Rev. 1 (1957).

(2) Beyond the things the State Legislature and the United States Attorney General have said and left unsaid the record before us presents no ground for sustaining the a priori judgment that some districts must have at least a 65%

---

**5.** Letter dated April 1, 1974, from Assistant Attorney General J. Stanley Pottinger to George D. Zuckerman, Assistant Attorney General, State of New York, at 1.

**6.** Brief for Intervenors-Appellees, N.A.A.C.P. et al., p. 4.

nonwhite majority where the county is 35.1% nonwhite and the State 13% nonwhite. I say this on "the record before us" to leave room for some conceivable record where a predetermined racial quota might be found constitutional. One may doubt profoundly that there will ever be such a case. Suffice it to say for now that the case before us is not it.

As reflected in the precedents reviewed by Judge Oakes, there is great constitutional force in the premise that the "[f]ramers of voting districts are required to be color blind." Ince v. Rockefeller, 290 F.Supp. 878, 884 (S.D.N.Y. 1968). See, e. g., White v. Regester, 412 U.S. 755, 765–770, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Whitcomb v. Chavis, 403 U.S. 124, 149–160, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). What should be still clearer is that the fourteenth and fifteenth amendments forbid the fashioning of electoral districts "so as to make the voice of one racial group weak or strong, as the case may be." Whitcomb v. Chavis, 403 U.S. 124, 176–177, 91 S.Ct. 1858, 1887, 29 L.Ed.2d 363 (1971) (Douglas, J., concurring and dissenting).

Racial or credal "proportional representation" offends against the most fundamental tenets of our constitutional scheme. Cassell v. Texas, 339 U.S. 282, 286–287, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Once we start racial—or religious or ethnic—quotas for voting purposes, we forsake the anchor of governmental neutrality that has kept us secure despite the sometimes raging storms of group conflict we have had to weather. Polyglot and unmelted as we are, we have been blessed with recurrent demonstrations of our ability to erase racial stigmatization as the sole test for selecting leaders and conferring power. We disgraced ourselves on the subject before we tardily elected a Catholic President. Our most tragic dilemma has been, certainly, the persecution of nonwhite people, and the degrading aspects of that are far from ended. But there is hope in the evidence of improvement. If there is any religious majority, one need not belong to it to be elected. As for skin color, appellants' papers call to our attention that 13 of our cities with populations exceeding 50,000 have nonwhite mayors although seven of those cities have white majorities and only two have nonwhite majorities exceeding 65%. Notable among the omissions from this compilation is Los Angeles, which, with a population approximately 18% black, has had a black mayor since 1973.[7]

"Racial electoral registers [dividing electoral districts along racial lines like the racial and religious lines known historically or currently in India, Lebanon, and elsewhere], like religious ones, have no place in a society that honors the Lincoln tradition—'of the people, by the people, for the people.' Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic and so on. Cf. Gray v. Sanders, 372 U.S. 368, 379 [83 S.Ct. 801, 807–808, 9 L.Ed.2d 821]. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has

---

7. See N.Y. Times, Nov. 27, 1974, p. 1, col. 1.

no business designing electoral districts along racial or religious lines." Wright v. Rockefeller, 376 U.S. 52, 66, 84 S.Ct. 603, 611, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting) (footnote omitted).

The mixed story of racial troubles and conflicts is a long one. But our concern is not with sociology or politics or history as such. It should be enough for us that fixed principles of constitutional law normally bar classifications by race and that we have been shown nothing whatsoever to justify the use of a 65% minimum majority for any race in any district as an advance prescription for districting.

The flaws in today's decision, as I see them, may become more clearly visible if we (a) consider generally how valid districting *should* proceed and (b) note some of the arguments offered as justifications for today's result in the opinion of the court. (a) To begin at the beginning, before problems of alleged illegality may appear, lawfully drawn state legislative districts presumably reflect some agreed assumptions, though the nature of these assumptions may not yet be a matter of absolute clarity. See Cousins v. City Council of City of Chicago, 503 F.2d 912, 917, 919 (7th Cir. 1974) ("legitimate or nonjusticiable concerns" may sustain districting decisions). It may be supposed that the lines ought to follow reasonably straight paths, swerving for geographic or community or political subdivision boundaries where necessary or rational, see Mahan v. Howell, 410 U.S. 315, 325, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Gaffney v. Cummings, 412 U.S. 735, 742, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), embracing substantially equal numbers of people, and forming perimeters as simple, regular, and "couth," cf. Gomillion v. Lightfoot, 364 U.S. 339, 340, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), as good faith and neutrality will allow. Most fundamentally for this case, the drawers of the lines must not be encapsulating or fencing out people of particular races or religions or ancestries, whether to maximize or minimize the strength of any racial or religious or ethnic groups.

If people have been forced in or out because of race, then, of course, the fences must be torn down and the districts in this manner redrawn lawfully. That is, the forbidden use of race must be overcome by some condign remedy. But what is the nature of the pre-existing wrong that could make it condign or permissible to set up a minimum quota of 65% or any percentage for one race or group of races? This record and the majority opinion will be searched in vain for an answer to this question.

Let us consider Kings County, the focus of our concern, and try to fathom better what is involved. The nonwhite population of the County is 35.1%. Were the nonwhite people spread evenly through the County, orderly and symmetrical districts could well include none with a nonwhite majority. Cf. Cousins v. City Council of City of Chicago, 503 F.2d 912, 921 (7th Cir. 1974).

Add another reality—that racial distribution is not even through the County. The *a priori* 65% figure could not serve, except by some wild accident not suggested to have happened in this case, to reflect the racial distribution in any fair, rational, racially neutral sense. Instead, it would ensure (as it did in this case) that an arbitrarily prescribed number of legislative districts must be gerrymandered to meet the prescription. It is, of course, conceivable that some particular district or districts, fairly and lawfully drawn, could come out with a population 65% (or any percent) nonwhite. But there is no faint suggestion that this is what happened here. There is no rational explanation of any kind for the 65% figure in *any* district because the figure was taken in advance, as a racial quota, rather than resulting from fair apportionment on constitutionally permissible principles. Cf. Note, Compensatory Racial Reapportionment, 25 Stan. L. Rev. 84, 99–100 (1972).

(b) The majority sees in this record "no showing . . . that the effect of the New York legislature's drawing

the 1974 district lines as it did was invidiously to cancel out or minimize the voting strength of white voters in Kings County." Whatever may be true of "Kings County" as a whole, there is precisely an impermissible cancellation or minimization if the massing of 65% or greater nonwhite majorities in the districts that concern us cannot be squared with the Constitution.

The majority goes on to say:

"Even considering that the assembly and senate districts here in question would now necessarily elect nonwhite assemblymen and senators, an assumption we by no means may make, there would be no disproportionately nonwhite representation in either house." (Footnotes omitted.)

Like the majority, I am prepared to repudiate the assumption. But the statement by the majority of why it makes no difference seems to me to extend the line of fallacious reasoning. What does it mean, *for purposes of constitutional law,* to speak of "disproportionately nonwhite representation"? Is that supposed evil suffered by Massachusetts, whose nonwhite Senator is returned by an electorate less than three percent nonwhite? The point, if only in passing, is that our Constitution forbids us to reason from notions about what kind of racial composition is "proportionate" or "disproportionate" in our legislatures.

The clear statement of the majority's different view comes in its footnote to the sentence last quoted. We are told there:

"The population of Kings County is 64.9 per cent white, 24.7 per cent black and 10.4 per cent Puerto Rican. Memorandum of Decision, United States Dep't of Justice, Nos. V6541–47, July 1, 1974, at 13. For purposes of the Voting Rights Act the Puerto Rican population is considered nonwhite. [But see note 4, *supra.*] *Id.* at 10–11. Thus Kings County is 35.1 per cent nonwhite. Under the 1972 districting, one out of the ten senate districts contained a substantial nonwhite majority population. Under the amended 1974 plan three of the districts, or 30 per cent, contain substantial nonwhite population majorities—proportionately slightly less minority concentration districts than the percentage of nonwhite voters in the county. Interim Report of The Joint Committee on Reapportionment, *supra,* note 8, at 5. Of the 22 assembly districts in Kings County six had over 60 per cent nonwhite population and one over 50 per cent nonwhite population under the 1972 plan. The 1974 plan created five districts having over 75 per cent nonwhite population and two of over 65 per cent. Thus seven or 31.4 per cent of the districts contain a majority of nonwhite population, again less than the percentage of the nonwhite population in the county. *Id.* at 7–8.

Here, if with unflagging deference, I find gaps in sheer logic as well as unacceptable constitutional doctrine. As I have mentioned earlier, a *minority* of any kind in a county need not be a majority in any district at all. See Cousins v. City Council of City of Chicago, 466 F.2d 830, 842–843 (7th Cir.), cert. denied, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972). There is no ground in logic or law for translating the percentage relationship of a minority to the whole county population into a *percentage of districts* over which that minority should have majority control, let alone majority control by some prescribed "effective" margin.

There are unbearable and absurd implications in the notion of "proportionality" between racial or ethnic *population* percentages and percentages of *districts* controlled by different racial or ethnic groups. Beyond the limited skin-color divisions, some 65% white and 35% "nonwhite," Kings County has 10.7% Italian immigrants or people with at least one parent who immigrated from Italy, some unknown additional percentage of Italian ancestry, a similar figure of 5.9% plus unknown additional Russian, 35% Roman Catholic, 4.7% recently immigrated Polish, 32.5% Protestant, 10.4% Puerto Rican, 1.7% recently from Austria, 1.7%

534

recently from Ireland (plus many more of Irish ancestry), 30.3% Jewish, 2.2% "other" religions, 1.3% recent German immigrants, plus a dizzying mass of others "whose lineage is so diverse as to defy ethnic labels." De Funis v. Odegaard, 416 U.S. 312, 332 (1974) (Douglas, J., dissenting).[8] How do we figure out the percentage of districts to be controlled by German Catholics, Russian Jews, black as against white Protestants, etc.? The short answer is, of course, that we don't. But the apparent "test" in today's majority opinion (31.4% nonwhite districts a "good" figure because less than the 35.1% nonwhite Kings County population) implies that perhaps we should. If that is not the implication, the point of the majority's footnote 21 is not discernible. If that is the implication, it is a matter specially and particularly opposed in this dissent.

This is, in sum, a case of racial quotas that are evil and dangerous because there is no semblance of justification for them. I would, therefore, reverse and hold the laws in question unconstitutional.

---

8. The figures cited are mostly from the 1970 U.S. Census. See also Council of Churches of the City of New York, "Protestant and Orthodox Church Directory," (1972), p. 81. The exact figures are, in any event, of no consequence. The point is, of course, the unsortable welter of multiform minorities.