Dean Butch WILSON, Johnny Middlebrooks, Plaintiffs-Appellees,

v.

Erskine MINOR, Perry Varner, Roy Moore, Curtis Williams, Kimbrough Ballard, in their official capacity as Dallas County Commissioners, United States of America, Defendants-Appellants.

No. 99-11145.

United States Court of Appeals,

Eleventh Circuit.

Aug. 4, 2000.

Appeal from the United States District Court for the Southern District of Alabama. (No. 96-01052-CV-BH-M), William B. Hand, Judge.

Before CARNES, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Defendants the Dallas County Commission, various county officials,[1] and the United States appeal the district court's order vacating its 1988 injunction which established a new election scheme[2] for the County Commission of Dallas County, Alabama as a remedy for a violation of section 2 of the Voting Rights Act. The district court found that the 1988 injunction changed the size of the County Commission and was therefore an impermissible remedy for a voting rights violation in light of recent Supreme Court and Eleventh Circuit precedent. Because the district court did not clearly err in finding that the 1988 injunction changed the size of the County Commission, and because the law prohibiting changes in the size of a governing body

---

[1] The named Defendants are: John W. Jones, Jr., in his official capacity as Probate Judge of Dallas County, Alabama; Harris Huffman, in his official capacity as Sheriff of Dallas County, Alabama; W.A. Kynard, in his official capacity as Circuit Court Clerk of Dallas County, Alabama; Erskine Minor, in his official capacity as a Dallas County Commissioner; John Lide, in his official capacity as a Dallas County Commissioner; Perry Varner, in his official capacity as a Dallas County Commissioner; Deans E. Barber, Jr., in his official capacity as a Dallas County Commissioner; and Ed Vancil, Barbara Sweat, and Thomas Craig, in their official capacities as members of the Dallas County Board of Registrars. Although named in the lawsuit as Defendants, John W. Jones and W.A. Kynard both agree with the district court order and have filed separate Appellee briefs in this action.

[2] The scheme is called the Lichtman plan and was described in *United States v. Dallas County Comm'n,* 850 F.2d 1433 (11th Cir.1988).

in order to remedy a section 2 violation is plain, we conclude that the district court did not abuse its discretion in vacating the 1988 injunction and affirm its order.

I.

The facts underlying this case are reasonably straightforward although the case has had a protracted procedural history. Prior to 1978, the Dallas County Commission was composed of four commissioners elected from at-large residency districts to concurrent *four year* terms. Dallas County commissioners served, and continue to serve, in a part-time capacity. The Dallas County probate judge acted as the chairperson of the Commission in an *ex officio* capacity.[3] The probate judge held a full-time position and was elected at-large to six year terms. In his capacity as the *ex officio* chairperson of the Commission, the probate judge presided over Commission meetings but, notably, voted only in the event of a tie among the four commissioners.[4] *See United States v. Dallas County Comm'n,* 850 F.2d 1430, 1432 (11th Cir.1988). In his capacity as probate judge, the probate judge also had authority to vote with the Commission in filling certain local office vacancies. *See* Act No. 196, 1949 Ala. Acts 227; Act No. 197, 1949 Ala. Acts 228; *Jones v. Dallas County,* 983 F.2d 237 (11th Cir.1993) (holding that the 1988 injunction did not preclude the probate

---

[3]The Alabama Court of Appeals has said that *ex officio* "means by virtue of the office." *Macon County v. Abercrombie,* 9 Ala.App. 147, 62 So. 449, 450 (1913). Black's Law Dictionary 597 (7th ed.1999) provides a more expansive definition explaining that an *ex officio* justice is: "A judge who serves on a commission or board only because the law requires the presence of a judge rather than because the judge was selected for the position."

[4]The origins of the current Dallas County Commission are found in a 1901 act of the Alabama legislature. Alabama Act No. 328 established "the court of county revenues for Dallas county" "to be composed of the judge of probate as principal judge, and four commissioners." Section 1 of the Act provided that the four commissioners "shall hold office for four years." Section 2 of the Act provided that "when the court hereby established shall be in session, the judge of probate shall be the presiding judge thereof when he is present ..., upon a tie vote the presiding judge shall give the casting vote." Section 6 of the Act divided the county "into four commissioner's districts" and required that "one commissioner shall be elected from each of said districts ...; provided, that all of said commissioners shall be elected by all of the qualified voters of said county." Act No. 328, 1900-01 Ala. Acts 890-92. In 1970, each court of county revenue was designated as the county commission. Act No. 26, 1970 Ala. Acts 2628, now codified at Ala.Code § 11-1-5.

2

judge from continuing to vote to fill the position of Dallas County tax collector in accordance with Act No. 197).

In 1978, the United States challenged the at-large method of electing members to the Dallas County Commission under section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, on the grounds that the at-large elections diluted the strength of black voters. *See United States v. Dallas County Comm'n,* 548 F.Supp. 875, 877 (S.D.Ala.1982), *aff'd in part, rev'd in part, vacated and remanded,* 739 F.2d 1529 (11th Cir.1984). In 1982, the district court held that the at-large method of electing county commissioners did not violate section 2 because the United States had not proved that the statute under which the at-large method of election was established was motivated by discriminatory intent or that it diluted black voting strength in Dallas County. *See Dallas County Comm'n.,* 548 F.Supp. at 919. We affirmed in part, reversed in part, and remanded the case to the district court with specific instructions to consider the role of racially polarized voting and the lingering effects of discrimination in Dallas County. *See United States v. Dallas County Comm'n,* 739 F.2d 1529 (11th Cir.1984). On remand, the district court found that the at-large election scheme for the Dallas County Commission diluted minority voting strength in violation of section 2. *See United States v. Dallas County Comm'n,* 636 F.Supp. 704, 710 (S.D.Ala.1986).

To remedy the section 2 violation, the district court ordered the county to adopt an election scheme that created four single-member districts. The district court retained the probate judge, still elected at-large, as the *ex officio* chairperson of the Commission. *See United States v. Dallas County Comm'n,* 661 F.Supp. 955, 958-59 (S.D.Ala.1987). We again reversed holding that the continued inclusion of the at-large elected probate judge as the *ex officio* chairperson of the Commission did not fully cure the Commission's section 2 violation. *See United States v. Dallas County Comm'n,* 850 F.2d 1430, 1432 (11th Cir.1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). We ordered Dallas County to adopt a five single-member districting plan for the County Commission with the chairperson of the Commission to be

chosen from among the five commissioners. *Id. See also United States v. Dallas County Comm'n,* 850 F.2d 1433 (11th Cir.1988) (describing the Lichtman plan).

The plan established two districts containing black voter majorities of 72.4 percent and 70 percent, two districts containing white voter majorities of 65 percent and 64 percent, and a fifth swing district containing a black voter majority of 61.3 percent. *See Dallas County Comm'n,* 850 F.2d at 1440. The plan required that the Commission be composed of five full members[5] serving the same term of four years and with the same full voting rights. The probate judge no longer served as the *ex officio* chairperson of the Commission; he no longer presided over meetings and did not vote in the event of a tie.[6] However, the probate judge retained authority to vote with the other commissioners when filling certain vacancies in local office just as he had prior to the 1988 injunction. *See Jones,* 983 F.2d 237 (11th Cir.1993). In short, the injunction replaced the role of the probate judge as *ex officio* chairperson of the Commission with a full commissioner elected specifically to that position. The role of the probate judge as probate judge, however, remained intact. On July 13, 1988, the district court directed that the election of the Dallas County Commission be conducted pursuant to the Eleventh Circuit's plan.[7]

On October 25, 1996, Plaintiffs Dean Butch Wilson and Johnny Middlebrooks, white residents of Dallas County, Alabama, filed suit against the Dallas County Commission, various county officials, and the United States alleging that the court-ordered election scheme changed the size of the County Commission and was, therefore, an improper remedy for a section 2 violation. Specifically, Plaintiffs argued that the

---

[5]Dallas County commissioners continued to serve, as they had prior to the injunction, in a part-time capacity.

[6]The office of the probate judge continued to be a full-time position, as it was prior to the injunction. However, the post injunction probate judge devoted all his time to the responsibilities of that office and no longer spent any of his time acting as the *ex officio* chairperson of the Commission.

[7]In March 1992, the Dallas County Commission adopted a new redistricting plan that maintained under the 1990 Census figures approximately the same racial population breakdown as the 1988 court-ordered plan.

removal of the probate judge as *ex officio* chairperson of the County Commission and the creation of a fifth

full commissioner, with the same voting rights and serving the same term of years as the other commissioners,

changed the size of the Commission from four members (plus the probate judge acting as chairperson in an

*ex officio* capacity) to five full members. Plaintiffs sought declaratory and injunctive relief from the

court-ordered plan. Plaintiffs also alleged that the districting plan then in place violated section 5 of the

Voting Rights Act because it had not been precleared, and that the 1988 injunction violated the Tenth

Amendment. On October 17, 1997, Plaintiffs amended their Complaint to add claims alleging that the 1988

injunction violated the Voting Rights Act and the Fourteenth Amendment.

The district court conducted a four day bench trial in May 1998. On March 29, 1999, the district

court entered judgment for the Plaintiffs. The court held that the 1988 injunction "impermissibly altered the

size" of the Dallas County Commission and was "both illegal and unjustified under the applicable law as well

as the circumstances of this case." Order at 3. The court terminated the 1988 injunction and ordered the

development and implementation of a four single-member district plan. The district court also ordered the

probate judge to resume his position as chairman *ex officio* with the sole duties of presiding over the

Commission's meetings and casting a vote in the event of a tie. Both the County Commission and the United

States appealed the district court's order.[8]

## II.

We review the district court's findings of fact for clear error, and we review its conclusions of law

*de novo. See DeKalb County School District v. Schrenko,* 109 F.3d 680, 687 (11th Cir.), *cert. denied,* 522

U.S. 1015, 118 S.Ct. 601, 139 L.Ed.2d 489 (1997). The decision to modify an injunction is subject to an

abuse of discretion standard, and it is an abuse of discretion to fail to make modifications required by

---

[8]In late March 2000, after oral argument had been heard in this case, the Dallas County Commission and the United States filed Emergency Motions for Stay asking this Court to stay the district court's March 29, 1999 Order and proceedings to enforce that Order pending our judgment on appeal, or alternatively for an order staying the primary elections for Dallas County commissioners until we ruled on the appeal. On April 5, 2000, we denied Appellants' Motions for Stay.

applicable law. *See Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1563 (11th Cir.1994); *Godfrey v. BellSouth Telecomm., Inc.,* 89 F.3d 755, 757 (11th Cir.1996).

A.

As an initial matter, the Defendants argue that the district court improperly allowed the Plaintiffs to challenge the 1988 injunction through an independent action rather than requiring them to intervene in the action in which the judgment was entered. The Defendants argue that because the Plaintiffs are trying to amend a judgment issued in a previous case, they should be forced to seek relief from the same court that entered the original judgment. Indeed, as a general matter, intervention pursuant to Fed.R.Civ.P. 24 is the appropriate way for an outsider with an interest in an existing lawsuit to come in as a party. *See* 7C Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1901, at 228 (1986). Intervention in the original action is also generally the proper mechanism for a nonparty to seek relief from an existing judgment. *See* 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2863, at 350 (1995); *see also Hines v. Rapides Parish School Board,* 479 F.2d 762, 765 (5th Cir.1973) (holding that "the proper course for parental groups seeking to question current deficiencies in the implementation of desegregation orders is for the group to petition the district court to allow it to intervene in the prior action").[9]

The Plaintiffs respond that as private citizens who were not parties to the previous action they were not obliged to intervene in that action when a personal right such as voting was at stake. Plaintiffs rely for support on *Martin v. Wilks,* 490 U.S. 755, 762-67, 109 S.Ct. 2180, 2184-87, 104 L.Ed.2d 835 (1989). In *Wilks,* the Supreme Court rejected the argument that because the plaintiff white firefighters failed to timely intervene in the initial court proceedings, their current challenge to actions taken under the consent decree arising out of the initial action constituted an impermissible collateral attack. *Id.* at 762, 109 S.Ct. at 2185. Instead, the Court held that the white firefighters could challenge employment decisions made pursuant to

---

[9]Fifth Circuit decisions issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

the consent decree through an independent action. *Id.* at 762-69, 109 S.Ct. at 2185-88. In rejecting a rule of mandatory intervention, the Supreme Court explained that it made more sense to place the burden on the party bringing a lawsuit to join all interested parties rather than to place on all potential additional parties the duty to intervene. *Id.* at 765, 109 S.Ct. at 2186. Because the plaintiffs were not joined in the original action, their independent claims were not therefore precluded. *Id.* at 761, 109 S.Ct. at 2184.[10]

While *Wilks* offers some support for the Plaintiffs' argument that the district court properly allowed them to bring an independent action challenging the 1988 injunction, we find even more compelling the fact, which both sides recognize, that in this case the Plaintiffs' collateral attack was for all practical purposes the same as an intervention in the original action. Notably, this independent action arose in the same district court and was heard by the same district judge who handled the original case. Moreover, the parties to the independent action include *all* of the parties to the original action, including the United States which was named in this case because of its status as a party to the prior proceeding, and the district court took judicial notice of those portions of the original proceedings on which the parties announced an intention to rely. For these reasons, this case does not implicate the potential problems and prejudice that can arise when plaintiffs are permitted to challenge relief entered by one court through a wholly independent action commenced in a different court and before a different judge. In short, Plaintiffs' independent action in this case raises no

_____

[10]Congress responded to *Wilks* in the Civil Rights Act of 1991 by explicitly limiting the ability of third parties to challenge consent decrees resolving claims of employment discrimination through a civil rights action. Section 108 of the Civil Rights Act provides that a consent degree may not be challenged under the civil rights laws by a person who prior to the entry of the judgment had actual notice of the proposed judgment "sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain." 42 U.S.C.2000e-2(n)(1). While the Civil Rights Act greatly curtailed the circumstances in which a nonparty can challenge a consent decree entered in a previous action, it does not address or undermine the portion of *Wilks* that is most relevant to our case; namely, the Civil Rights Act does not have anything to say about whether a nonparty, in cases where it may challenge a previous judgment, must do so through intervention or an independent action. The Supreme Court's logic that such a challenge may be made through an independent action rather than through intervention remains unaffected by the Civil Rights Act. Moreover, this case does not fall within the set of third party actions curtailed by the Civil Rights Act because this case involves a challenge to an injunction remedying a Voting Rights Act violation rather than a challenge to a consent decree arising in an employment discrimination case.

7

danger that different courts will levy competing and contradictory judgments upon the Defendants.  As a result, we have little difficulty in concluding that in this case the district court did not err by allowing the Plaintiffs to bring their challenge to the 1988 injunction through an independent action.[11]

---

[11]The dissent contends that the Plaintiffs lack Article III standing to assert their claims because they have failed to demonstrate that they have suffered any concrete and particularized injury stemming from the 1988 injunction.  As an initial matter, we note that neither Defendant saw fit to challenge the Plaintiffs' standing on appeal.  Of course, a federal court has an independent obligation to ensure that it has jurisdiction over any claim brought before it even if jurisdictional questions are not raised by either party.  *See United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (noting that "[t]he question of standing is not subject to waiver....  'The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines.' ") (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230-31, 110 S.Ct. 596, 607-08, 107 L.Ed.2d 603 (1990)) (internal quotation marks omitted);  *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 410 (11th Cir.1999) (emphasizing that "it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking").  Therefore, while the Defendants' silence does not absolve us of the responsibility to do our own standing analysis, we find it significant that neither the United States nor the Dallas County Commission found this argument worthy of mention on appeal.

In support of its standing argument, the dissent suggests that this Circuit's decision in *Meek v. Metropolitan Dade County Florida,* 985 F.2d 1471 (11th Cir.1993), which is directly on point, has been overruled by more recent Supreme Court cases.  In *Meek,* this Court affirmed the standing of voters to participate in an action challenging the constitutionality of the voting scheme to which they were subject.  The plaintiffs, black and Hispanic residents of Dade County, challenged a voting scheme in which the eight County Commissioners were selected from eight districts but each commissioner was elected at-large.  The plaintiffs argued that the at-large election scheme violated section 2 of the Voting Rights Act. Two residents of Dade County who were registered voters sought to intervene to defend the existing election scheme.  The district court denied the intervenors' motions to intervene holding that their interests were identical to the defendants' and adequately represented by them.  After a bench trial, the district court ruled that the election scheme did violate section 2, and the defendants decided not to appeal the decision.  The intervenors filed new motions to intervene in order to pursue the defendants' appeal.  The district court denied these motions without explanation. On appeal the plaintiffs argued that the intervenors lacked standing to intervene because they "lack[ed] sufficiently substantial legally protectible interests." *Meek,* 985 F.2d at 1480.  This Court reversed making clear that the intervenors had suffered an injury sufficiently concrete not only to permit them to intervene in the action but also sufficient to give them standing to defend the general election scheme on appeal.  We explained that:

The intervenors sought to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered.  As such, they alleged a tangible actual or prospective injury and did not merely challenge unlawful conduct in the abstract.  *See generally, e.g. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 574-75, 112 S.Ct. 2130, 2144, 119 L.Ed.2d 351 (1992).  Moreover, we reject appellees' contention that the intervenors had only nonjusticiable generalized grievances simply because they asserted interests widely

shared by others. **Note 11—Continued** *Allen v. Wright,* 468 U.S. 737, 756-60, 104 S.Ct. 3315, 3327-29, 82 L.Ed.2d 556 (1984).

*Id.* at 1480. *See also Clark v. Putnam County,* 168 F.3d 458, 462 (11th Cir.1999) (holding that six black voters were entitled to intervene to defend a court-ordered single-member-district voting plan because they had an interest at stake in the action and that interest was not adequately represented by the existing defendant in the action). Like the intervenors in *Meek,* the Plaintiffs in this case seek to protect their interests in being free from an illegal court-imposed electoral system.

Instead of addressing *Meek* head on, the dissent suggests that its holding has been overruled or somehow eviscerated by the Supreme Court in *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), and *Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635. The dissent relies on these cases for two broad assertions: *first,* that in order to have standing "a person must show ... an invasion of a legally protected interest that is concrete and particularized and actual or imminent," *Arizonans for Official English,* 520 U.S. at 64, 117 S.Ct. at 1067 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)) (internal quotation marks omitted); and *second,* that "a generalized grievance against allegedly illegal governmental conduct" is not sufficient to establish standing, *Hays,* 515 U.S. at 743, 115 S.Ct. at 2435 (citations omitted). A more detailed and critical analysis of these cases, however, makes clear that neither offers support for the dissent's position in this case.

In *Arizonans for Official English,* a state employee, Maria-Kelly F. Yniguez, sued the State and its Governor, Attorney General, and Director of the Department of Administration seeking an injunction against enforcement of a state constitutional amendment making English the state's official language. Both the district court and the court of appeals ruled that the English only amendment was unconstitutional. The Supreme Court vacated these opinions and held that because Yniguez had resigned from her position with the state while the case was on appeal the case had become moot. In dicta the Court expressed "grave doubts" about whether the sponsors of the amendment, Arizonans for Official English Committee (AOE) and its Chairman, Robert Park, had standing to intervene to defend the amendment's constitutionality on appeal. *Arizonans for Official English,* 520 U.S. at 66, 117 S.Ct. at 1068. AOE and Park argued that as the initiative proponents they had a quasi-legislative interest in defending the constitutionality of the measure they sponsored. The Court noted that while it has "recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests," *id.* at 65, 117 S.Ct. at 1068, AOE and its members were not elected representatives and the Court was "aware of no Arizona law appointing initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State," *id.* The Court also cast doubt on AOE's assertion of representational or associational standing noting that "[t]he requisite concrete injury to AOE members is not apparent." *Id.* at 66, 117 S.Ct. at 1068.

The question of whether AOE and Park had standing as the sponsors of particular legislation to represent the state's interest in defending that legislation provides no guidance on whether *voters* who live within a governing unit have standing to challenge an allegedly illegal voting scheme to which they are subject by virtue of their residence. Moreover, the Court in *Arizonans for Official English* did not even resolve the standing issue because of its conclusion that the case was moot. *Id.*

In *Hays,* the Supreme Court held that the appellees lacked standing to challenge a Louisiana redistricting plan when none of the appellees *resided* in the district that was the primary focus of their racial gerrymander claim. *Hays,* 515 U.S. at 739, 115 S.Ct. at 2433. The Court emphasized, however, that voters who lived in the allegedly gerrymandered district would have suffered an injury sufficient to establish standing. According to the Court, "Where a plaintiff resides in a racially gerrymandered district [ ] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Hays,* 515 U.S. at 744-45, 115 S.Ct. at 2436 (citations omitted). The dissent relies on *Hays* to argue that because the Plaintiffs allege only that they are residents of Dallas County, rather than of a particular racially gerrymandered district, they have not satisfied the requirements of standing. Dissenting Op. at 3287. This argument misapplies the holding of *Hays.*

*Hays* lays down a bright-line standing rule for a particular class of cases alleging illegal racial gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district. There is no suggestion in *Hays*—or any subsequent decision that we are aware of—that the district-by-district analysis adopted in that decision applies to a case such as this or *Meek* which does not have anything to do with gerrymandering and relates instead to an allegedly illegal electoral scheme covering an *entire* election area.

This is not a case in which the plaintiffs are alleging racial gerrymandering in one particular voting district where they do not reside. In this case, the Plaintiffs contend that all of Dallas County is being subjected to an illegal election scheme that expands the size of the County Commission from four members to five members thereby altering the voting strength of each voter within the County. Unlike in *Hays,* the Plaintiffs in this case are residents of the area governed by the challenged illegal election scheme and their voting powers plainly are affected by that scheme.

Moreover, we emphasize that *Hays'* narrow holding regarding standing in the gerrymandering context is entirely consistent with our broader holding in *Meek.* In *Hays,* the Supreme Court held that plaintiffs had standing to bring their racial gerrymandering claim if they lived in the allegedly gerrymandered district. In *Meek* we held that respondents had standing to defend the election scheme to which they were subject when that entire election scheme had been challenged as illegal. In both cases the essential point remains that in order to have standing one must reside in the area directly affected by the allegedly illegal voting scheme. *Hays* is in no way inconsistent with our holding in *Meek.*

Simply put, the case at hand is squarely controlled by this Court's holding in *Meek. Meek* has neither been explicitly overruled nor implicitly undermined by the Supreme Court's decisions in *Arizonans for Official English,* or *Hays,* and we are bound to follow it. *See United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993) (explaining that "it is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled *en banc,* or by the Supreme Court"). Moreover, our decision in *Meek* is altogether consistent with the holdings of other circuits granting voters standing to challenge election schemes to which they are subject. *See League of United Latin American Citizens, Council No. 4434 v. Clements,* 999 F.2d 831 (5th Cir.1993) (finding judges who had intervened as defendants had Article III standing as voters affected by the challenged judicial election scheme to pursue the

B.

The law relevant to the Plaintiffs' challenge to the 1988 injunction is by now clear and undisputed. A federal court cannot modify the size of an elected governing body in order to remedy a section 2 violation because there is no principled reason to choose a legislative body of one size over one of a different size for the purposes of determining whether there has been vote dilution. *See generally Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996); *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (*en banc* ), *cert. denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). In *Holder,* black voters argued that the size of the county commission of Bleckley County, Georgia violated section 2 of the Voting Rights Act. Bleckley County always had a single-commissioner form of government, but in 1985 the state legislature authorized the county to adopt by referendum a multimember commission consisting of five members elected from single-member districts and a chair elected at-large. Voters, however, defeated the proposal thereby prompting a challenge by black voters. A majority of the Supreme Court held that the size of a governing body is not subject to a vote dilution challenge under section 2. The plurality opinion, written by Justice Kennedy and joined by Chief Justice Rehnquist and Justice O'Connor, explained that in order to find liability in a section 2 case, a court must find a reasonable alternative practice as a benchmark against which to measure whether the existing voting practice results in vote dilution. *Holder,* 512 U.S. at 880, 114 S.Ct. at 2585. The plurality then explained that "the search for a benchmark is quite problematic when a § 2 dilution challenge is brought to the size of a government body" because "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* at 881, 114 S.Ct. at 2586. The plurality therefore concluded that "a plaintiff cannot maintain a § 2 challenge to the size of a government body, such as the Bleckley County Commission." *Id.* at 885, 114 S.Ct. at 2588. Justices Thomas and Scalia agreed with the holding that "the size of a governing

case independently on appeal); *United Jewish Organizations of Williamsburgh, Inc. v. Wilson,* 510 F.2d 512 (2nd Cir.1975) (holding that white voters had standing as voters to challenge New York's legislative redistricting plan designed to comply with the Voting Rights Act).

11

body cannot be attacked under § 2" but rested their concurrence on other grounds.[12] *See Id.* at 891, 114 S.Ct. at 2591 (Thomas, J., concurring in judgment).

We have since held twice that *Holder* limits the remedial powers of the federal courts under section 2 and prohibits district courts from changing the *size* of a county governing body. In *Nipper* we rejected a section 2 vote dilution challenge brought by black registered voters and an association of black attorneys to the at-large election system used to elect the judges of Florida's Fourth Judicial Circuit Court. The plaintiffs contended that the use of at-large elections diluted black voting strength. They sought the creation of subdistricts that would ensure their ability to elect black judges of their choice. *Nipper,* 39 F.3d at 1496-97. In rejecting the plaintiffs' claim for relief, we emphasized that "under *Holder,* federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies.... Federal courts may not [ ] alter the state's form of government itself when they cannot identify 'a principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison.' " *Id.* at 1532 (quoting *Holder,* 512 U.S. at 881, 114 S.Ct. at 2586).

Similarly, in *White,* we vacated the district court's approval of a settlement agreement entered into between a class of black voters in Alabama and the State of Alabama which would have increased the size of the Alabama courts of appeals. *White,* 74 F.3d at 1061. In *White,* a class composed of all black voters in Alabama argued that the at-large election process used to elect members of Alabama's appellate courts diluted the voting strength of black voters in violation of section 2 of the Voting Rights Act. *Id.* at 1059. The parties entered an agreement, which the United States Department of Justice precleared, that would have restructured the Supreme Court of Alabama, the Court of Criminal Appeals, and the Court of Civil Appeals by increasing the size of those courts and creating a selection process that would ensure that the black voters of Alabama

---

[12]Justice Thomas emphasized that "[o]nly a 'voting qualification or prerequisite to voting, or standard, practice, or procedure' can be challenged under § 2" and concluded that the size of a governing body is not a "standard, practice, or procedure" within the terms of section 2. *Holder,* 512 U.S. at 892, 114 S.Ct. at 2591.

had at least two "representatives of their choice" on each court. *Id.* at 1061. The district court approved the

agreement and made it part of the final judgment. *Id.* at 1061. Again, we held that in approving such relief

the district court exceeded its authority under section 2 and vacated the district court's judgment. *Id.* at 1061.

We emphasized that under *Holder* and *Nipper,* the district court "lacked the authority to require Alabama to

increase the size of its appellate courts." *Id.* at 1072.

No one disputes that this is binding authority applicable in this case. The primary issue, then, is the

factual one of whether the 1988 injunction imposed by the district court changed the size of the Dallas County

Commission.[13] More specifically, the question boils down to this: whether the pre-injunction probate judge

acting in his role as *ex officio* chairperson of the Commission should be counted as a full member of the

---

[13]Just as the determination of whether there has been vote dilution in a section 2 Voting Rights Act case is a finding of fact, so too is the determination of whether there has been a change in the size of the Dallas County Commission an ultimate finding of fact subject to clear error review. *See Thornburg v. Gingles,* 478 U.S. 30, 78-79, 106 S.Ct. 2752, 2780-81, 92 L.Ed.2d 25 (1986) (affirming that ultimate finding of vote dilution is a question of fact subject to the clearly erroneous standard of review). In *Gingles,* the Supreme Court explained that the "ultimate finding of vote dilution" is a question of fact because the trial court's determination is necessarily based on a consideration of the totality of the circumstances and is " 'peculiarly dependent upon the facts of each case.' " *Id.* at 79, 106 S.Ct. at 2781 (quoting *Rogers v. Lodge,* 458 U.S. 613, 621, 102 S.Ct. 3272, 3277, 73 L.Ed.2d 1012). *Cf. United States v. DeVaron,* 175 F.3d 930, 938 (11th Cir.1999) (*en banc* ) (holding that determination of defendant's role in the offense is an ultimate finding of fact subject to the same clear error review as were the subsidiary facts on which it was based); *Tinkler v. United States,* 982 F.2d 1456, 1466 (10th Cir.1992) (noting that ultimate findings "like 'subsidiary' fact-findings, are subject nevertheless to the rule that findings of fact are not to be set aside unless clearly erroneous"). Similarly, in *De Varon,* we held that a district court's determination of a defendant's role in the offense is a finding of fact to be reviewed for clear error. *De Varon,* 175 F.3d at 937. We explained that the determination regarding role in the offense was based directly and without legal intermediation or interpretation on the district court's subsidiary factual findings regarding "the defendant's role in her relevant conduct and the relative degrees of culpability of the other participants in that conduct." *Id.* at 938. In this case, as in *Gingles* and *DeVaron,* the ultimate question about whether the size of the Commission changed is derived directly from the district court's subsidiary factual findings regarding the differences in voting power, term in office, and duties of the probate judge as *ex officio* chairperson and the full Commission member with whom he was replaced. We add that this determination is not a mixed question of law and fact because the question about the size of the Commission flows directly from the subsidiary factual findings and is unmediated by any intervening legal standard or definition. *See Suburban Realty Co. v. United States,* 615 F.2d 171, 181 (5th Cir.1980) (explaining that a question that involves the application of legal standards to facts is best characterized as a mixed question of fact and law); *Stevens v. United States,* 302 F.2d 158, 165 (5th Cir.1962) (noting that a mixed question of law and fact involves the application of a legal standard to a particular situation).

Commission for the purposes of determining the pre-injunction size of the Commission. If the probate judge acting as chairperson of the Commission in an *ex officio* capacity had essentially the same duties, power, and purpose as the full Commission member with whom he was replaced, then we must find that the size of the Commission did not change. If however, the probate judge acting as *ex officio* chair of the Commission played a significantly different role on the Commission than did the full Commission member with whom he was replaced then the size of the Commission did change. We conclude that because the differences between the role of the probate judge acting as chairperson of the Commission in an *ex officio* capacity and the role of a full Commission member are indeed substantial and important, the district court did not clearly err in finding that the 1988 injunction changed the size of the Dallas County Commission.

Defendants argue simply that the 1988 injunction did not change the size of the Commission because before the injunction the probate judge in his role as *ex officio* chairperson acted as a full Commission member. They contend that both before and after the 1988 injunction the Commission should be viewed as having five members, and only the manner of electing the officials changed. Defendants contend that the fact that the probate judge was an *ex officio* member of the Commission does not mean that he was not a full member. They stress that historically the probate judge played an active role in the Commission.[14] Moreover, they argue that the differences in voting rights between the pre-1988 probate judge as *ex officio* chairperson and the current chairperson do not indicate that the probate judge/chairperson was not a full Commission member. While they concede, as they must, that the pre-injunction probate judge/chairperson did not have full voting rights, they observe that he was the deciding vote in the event of a tie and therefore voted in every situation in which his vote would have made a difference. The Defendants add that the probate judge/chairperson's tie-breaking voting power indicates that the probate judge played as significant a role in

_____

[14]Appellants point out that Probate Judge John W. Jones, the Commission Chairperson before 1988, represented the Commission in meetings and on various committees and was a spokesperson for the Commission at private and public functions.

policy-making as did the other four commissioners and shows that Commission policy before the 1988 injunction was set by five, rather than four Commission members.

Defendants also point to *Dillard v. Crenshaw County, Ala.,* 831 F.2d 246 (11th Cir.1987) in support of their contention that the pre-1988 probate judge acting in his capacity as the *ex officio* chairperson of the Commission should be considered a full Commission member. *Dillard* involved a section 2 challenge to the at-large election of the commissioners of the Calhoun County Commission in Calhoun County, Alabama. The Calhoun County Commission was originally composed of two associate commissioners and a chairperson, all elected at-large. The district court issued an injunction against the at-large election of the commissioners and ordered Calhoun County to respond with proposals as to how to solve the section 2 violation. Calhoun County responded with a proposal to increase the membership of the commission to five but to retain the position of an at-large commission chairperson. The district court rejected the at-large chair position and ordered instead that the chair rotate among the five associate commissioners. On appeal, we considered whether the district court correctly ruled that the at-large position proposed by Calhoun County failed to correct the original section 2 violation. Calhoun County tried to distinguish the new proposed chairperson elected at-large, from the old position in an effort to argue that the new chairperson really held an independent office and should not be subject to the proportional representation issues of section 2. Calhoun County emphasized that the proposed commission chairperson would have only a limited legislative role; he would preside over commission meetings but would have no vote except in the case of a tie. Calhoun County argued that because the new chairperson would serve primarily an administrative, not a legislative role, the chairperson should not be considered a full member of the commission. Instead, the County argued, the proposed chairperson position should be treated as a separate single-member office.

We rejected the County's argument and held that because of the historical and practical overlap between the roles of the commission and the chairperson, the chairperson could not be considered a separate single-member office position. *See Dillard,* 831 F.2d at 251. We held that the chairperson was a full member

15

of the commission subject to proportional representation issues and that the district court correctly ruled that electing the chairperson at-large failed to correct the original section 2 violation. *Id.* at 252-53.

Appellants contend that because the proposed chairperson in *Dillard* was considered a full commission member for the purposes of a section 2 remedy, the pre-injunction probate judge acting in his capacity as *ex officio* chairperson also should be considered a full member of the Commission since the two had similar roles and the same voting capacity. However, we do not find *Dillard* a helpful model for the present case. There are critical differences between the two cases which undermine *Dillard's* usefulness in helping us determine whether the pre-injunction probate judge acting in his capacity as *ex officio* chairperson in the present case should be counted as a full commission member.

In *Dillard,* the chairperson had historically been a full member of the commission. The commission was originally composed of two associate commissioners and a chairperson, all of whom were elected at-large from the whole county and all of whom had full and equal voting power. *See id.* at 247. The historical status of the chairperson as a full commission member with full and equal voting power was critical to our conclusion in *Dillard* that the proposed chairperson should also be treated as a full commission member for section 2 purposes. *See id.* at 251 (explaining that "[b]oth historically and practically, the overlap between the roles of the commission and the chairperson do not allow us to consider this office as a separate, single-office position"). Notably, *Dillard* did not involve the question raised in the present case of whether a probate judge acting as a chairperson in an *ex officio* capacity, with substantially different voting powers, a different term of office, and different responsibilities from the other commissioners, should be considered a full commission member for the purposes of determining the size of the governmental body. The fact that we previously held that a proposed commission chairperson designed to replace a position historically filled by a full commission member must be treated as a full member for purposes of a section 2 challenge, does not shed light on whether in this case the pre-injunction probate judge acting in his capacity as the *ex officio*

16

chairperson of the Commission, who was not historically treated as a full Commission member, should be counted as a full member for the purposes of determining the size of the commission.

Plaintiffs emphasize what appear to us to be several critical differences here between the pre-injunction probate judge acting in his capacity as the *ex officio* chairperson of the Commission and the full Commission member with whom he was replaced after the injunction. First, the probate judge was elected as a probate judge, not as a Commission member. The probate judge simply acted as chairperson of the Commission in an *ex officio* capacity but was never elected to a position on the Commission. Second, the probate judge was chosen in different elections and served a different term of years than did the commissioners. Therefore, while the commissioners served concurrent four year terms on the Commission, the probate judge, who was elected to six year terms, served as the *ex officio* chairperson of the Commission for a longer term of years. Third, in his capacity as *ex officio* chairperson of the Commission, the probate judge did not possess the same voting rights as did the other commissioners. Instead of voting on all matters, the probate judge acting as chairperson *ex officio* voted only in cases of a tie.[15]

We emphasize that the issue before us is the narrow and discrete factual question of whether the change from a Commission composed of four full commissioners plus a probate judge acting as chairperson in an *ex officio* capacity—who was elected to a different position, holds office for a different term of years, and has different voting powers on the Commission than the full members—to a Commission composed of five full Commission members (one of whom is designated as chairperson)—who were all elected specifically to that office, all hold office for the same term of years, and all possess the same voting powers—is significant enough for us to conclude that a change in the size of the Commission occurred. We recognize

---

[15]We note, however, that both before and after the 1988 injunction, the probate judge in his role as probate judge had authority to vote with the Commission when filling certain vacancies in local office. *See* Act No. 196, 1949 Ala. Acts 227; Act No. 197, 1949 Ala. Acts 228; *Jones v. Dallas County,* 983 F.2d 237 (11th Cir.1993) (holding that the 1988 injunction did not preclude the probate judge from continuing to vote to fill the position of Dallas County tax collector in accordance with Act No. 197). Therefore, the role of the probate judge as probate judge remained largely the same both before and after the injunction.

that real arguments exist on the other side and that the determination of whether the probate judge acting as *ex officio* chairperson looks like a full Commission member for purposes of comparing the sizes of the pre and post injunction Commissions is largely a judgment call. However, we find that the differences in role, purpose, and power between the probate judge acting as chairperson of the Commission in an *ex officio* capacity and a full Commission member are significant and compel us to conclude that the 1988 injunction effectively changed the size of the Dallas County Commission.

Perhaps even more important than our own finding, however, is the fact that the district court made a clear and unequivocal factual finding that the 1988 injunction changed the size of the Dallas County Commission and we must review this finding for clear error. *See Thornburg v. Gingles,* 478 U.S. 30, 78-79, 106 S.Ct. 2752, 2780-81, 92 L.Ed.2d 25 (1986) (affirming that ultimate finding of vote dilution is a question of fact subject to the clearly erroneous standard of review); *United States v. De Varon,* 175 F.3d 930, 938 (11th Cir.1999) (*en banc*) (explaining that ultimate factual findings like the subsidiary facts on which they are based are entitled to clear error review); *Tinkler v. United States,* 982 F.2d 1456, 1466 (10th Cir.1992) (noting that ultimate findings "like 'subsidiary' fact-findings, are ... not to be set aside unless clearly erroneous"). According to the district court, the 1988 injunction "impermissibly altered the size of [the Dallas County Commission] [ ] by expelling the chairman *ex-officio* simply because he was also the Probate Judge who must be elected at-large and by creating a previously unauthorized commissioner position...." Order at 3.[16] Indeed, the district court's finding is consistent with our own prior understanding of the effect of the 1988 injunction. In this Court's 1988 decision instructing the district court to impose the 1988 injunction, we explicitly recognized that the result of the injunction was an alteration of the size of the Commission. We

---

[16]The district court concluded that Appellants' attempt to equate the pre-injunction probate judge/chairperson with a regular commission member is comparing "apples with oranges in an effort to avoid the limitations which are now recognized as legitimate proscriptions against judicial overreaching." Order at 19.

stated: "The court is aware that its adoption of a five single-member district plan results in the creation of an additional elected official." *Dallas County Comm'n,* 850 F.2d at 1432 n. 2.

After thoroughly reviewing all of the evidence before us, we conclude that the 1988 injunction is most accurately understood as changing the size of the Dallas County Commission. The district court found as much and we hold that this finding was not clear error. In light of this factual finding and the clear precedent from both the Supreme Court and this Circuit establishing that a change in the size of a governing body is not a proper remedy for a section 2 violation, the district court's conclusion that the 1988 injunction was an impermissible remedy for a section 2 violation was essential. Accordingly, we conclude that the district court did not abuse its discretion in vacating the 1988 injunction and affirm its March 29, 1999 Order.

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

I dissent because I do not believe that the plaintiffs have standing in this case. Wilson and Middlebrooks filed suit to terminate an injunction entered in an earlier case in which they never participated, either as plaintiffs, defendants or intervenors. Because they fail to demonstrate that they have suffered any concrete and particularized injury stemming from this earlier injunction, they have also failed to demonstrate that they have standing under Article III of the Constitution to bring these claims. *See Federal Election Comm'n v. Akins,* 524 U.S. 11, 23-24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); *Arizonans for Official English v. Arizona,* 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). On this record there is no basis for concluding that Wilson and Middlebrooks satisfy the elements of standing, either as plaintiffs in this independent action or in order to intervene in the earlier lawsuit.

Before a federal court may exercise jurisdiction over a claim brought before it, the court must determine that the litigants have standing to bring that suit. As the Supreme Court has emphasized repeatedly,

> [t]he question of standing is not subject to waiver, however: "[We] are required to address the issue even if the courts below have not passed on it, and *even if the parties fail to raise the issue before us."*

19

The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.

*United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (emphasis added) (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230-231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)); *see also Arizonans,* 520 U.S. at 73, 117 S.Ct. 1055. The Supreme Court has "made clear that it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *United States v. Hays,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (citations and internal quotation marks omitted). Wilson and Middlebrooks have not borne this burden.

In order "[t]o qualify as a party with standing to litigate, a person must show, first and foremost, an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Arizonans,* 520 U.S. at 64, 117 S.Ct. 1055 (citing *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130) (internal quotation marks omitted). As the Court made clear in *Lujan,* in order to be "particularized," the injury "must affect the plaintiff in a personal and individual way." *Id.* at 560-61 & n. 1, 112 S.Ct. 2130. The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Hays,* 115 S.Ct. 2431, 515 U.S. at 743 (citations and internal quotation marks omitted).

In its footnote, the majority relies on *Meek v. Metropolitan Dade County,* 985 F.2d 1471, 1480 (11th Cir.1993), to support standing in the instant case. *Meek,* an Eleventh Circuit case decided prior to the Supreme Court's decisions in *Arizonans* and *Hays,* stated that individuals have a private right "to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered." *Id.* However, in light of more

20

recent Supreme Court pronouncements on standing, I do not think that such an ill-defined interest is sufficiently concrete to support standing under Article III.[1]

In *Hays,* the Supreme Court expressly affirmed the rule against generalized grievances, holding that the mere fact that appellees in that case were residents and voters of Louisiana was not sufficient to give them standing to challenge Louisiana's congressional redistricting plan. The Court rejected appellees' position that "anybody in the State has a claim," *Hays,* 515 U.S. at 743-44, 115 S.Ct. 2431, and restricted standing to "those who are *personally denied equal treatment* " by the challenged discriminatory conduct. *Id.* (emphasis added). The Court contrasted the generalized grievance asserted by appellees in that case with the type of concrete equal protection injury that would be sufficient to sustain standing. The Court found that residents of a racially gerrymandered district would have standing to challenge the redistricting because "[v]oters in such districts may suffer the special representational harms racial classifications can cause in the voting context."[2] *Id.* at 745, 115 S.Ct. 2431.

The panel in *Meek* rejected the contention that the intervenors had only nonjusticiable generalized grievances on the grounds that "if we accepted such an argument, we would be forced to conclude that most of the plaintiffs also lack standing, a conclusion foreclosed by the many cases in which individual voters have been permitted to challenge election practices," citing as precedent *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The recent Supreme Court cases make clear that this reasoning misconceives the nature of the injury alleged in voting rights cases. Plaintiffs' standing to assert their claims against the challenged election practices in

---

[1]The two decisions of other circuits which the majority cites in support of standing were also decided prior to *Arizonans* and *Hays. See League of United Latin American Citizens, Council No. 4434 v. Clements,* 999 F.2d 831 (5th Cir.1993); *United Jewish Organizations of Williamsburgh, Inc. v. Wilson,* 510 F.2d 512 (2nd Cir.1975).

[2]The *Hays* Court stated that a voter would have standing "[w]here a plaintiff resides in a racially gerrymandered district," 515 U.S. at 745, 115 S.Ct. 2431 explaining that in such a situation "the plaintiff has been denied equal treatment *because of the legislature's reliance on racial criteria,* and therefore has standing to challenge the legislature's action." *Id.* (emphasis added).

21

*Whitcomb,* 403 U.S. at 128-29, 91 S.Ct. 1858, and *Carr,* 369 U.S. at 207-8, 82 S.Ct. 691, derived not from their status as individual voters, but from the fact that they were personally denied equal treatment in violation of the Fourteenth Amendment. Similarly, the plaintiffs in *Meek* alleged a concrete injury in the form of vote dilution under Section 2 of the Voting Rights Act. *See Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1541-42 (11th Cir.1990). Those plaintiffs, as *Hays* recognizes, alleged cognizable injury to their statutory or constitutional rights.

In the instant case, plaintiffs fail to allege in their complaint either the exact nature of the alleged injury suffered or that they have any "personal stake" in the outcome of this litigation. *See Lujan,* 504 U.S. at 583, 112 S.Ct. 2130. We are left to speculate in what personal and individual way they have been injured.[3] Plaintiffs' claim that the Court's injunction in the earlier suit was ultra vires in light of *Holder* is no more specific than an assertion of the generalized right to have the government "act in accordance with law," a right which the Supreme Court rejected in *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Nor do plaintiffs articulate any cognizable theory of harm under equal protection or vote dilution jurisprudence. To the contrary, the majority writes that Wilson and Middlebrooks "seek to protect their interests in being free from an illegal court-imposed electoral system." This characterization, and the concomitant implication that all of Dallas County would have standing to bring suit because "all of Dallas County is being subjected to an illegal election scheme," only serves to underscore the generalized nature of Wilson and Middlebrook's grievance. As the *Hays* court explained,

---

[3]Based on this record, plaintiffs have not demonstrated standing to bring any of their claims. Plaintiffs fail to allege any injury stemming from the alleged violation of the Tenth Amendment. Nor do they allege any injury to their constitutional or statutory rights under the Fourteenth Amendment and the Voting Rights Act. In contrast, for example, to the original *Dallas* plaintiffs, these plaintiffs do not allege that their vote is diluted, or that they have suffered injury "as a direct result of having personally been denied equal treatment." *Id.* Their asserted right "not to be governed by public officials not chosen under state law using race-based selection criteria" is not a cognizable injury in the Article III sense. Merely sharing an interest generally with the public at large in the proper application of the Constitution and laws is insufficient to allege an injury. *See Arizonans,* 520 U.S. at 64, 117 S.Ct. 1055.

22

> Appellees insist that they challenged Act 1 in its entirety, not District 4 in isolation. That is true. It is also irrelevant. The fact that Act 1 affects all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean-even if Act 1 inflicts race-based injury on some Louisiana voters-that every Louisiana voter has standing to challenge Act 1 as a racial classification. Only those citizens able to allege injury "as a direct result of having personally been denied equal treatment," *Allen,* 104 S.Ct. 3315, 468 U.S. at 755, may bring such a challenge, and citizens who do so carry the burden of proving their standing as well their case on the merits.

*Hays,* 115 S.Ct. 2431, 515 U.S. at 746. The election scheme currently in place in Dallas County affects the voters of Dallas County to the same extent that the Louisiana districting scheme affected appellees in *Hays.* However, as that case makes clear, Article III requires something more than merely being affected in order to assert a cognizable injury. The racial classification suffered by those residents of a racially gerrymandered district meets this requirement; mere "residence in the area directly affected by the allegedly illegal voting scheme," maj. op. at 3280, n. 11, does not.

Just as Wilson and Middlebrooks have not demonstrated that they have standing to bring this independent action, I do not believe that they could have overcome their standing problem by moving to intervene in the earlier suit. "The decision to seek review is not to be placed in the hands of concerned bystanders, persons who would seize it as a vehicle for the vindication of value interests." *Arizonans,* 117 S.Ct. 1055, 520 U.S. at 64 (citations and internal quotations marks omitted). If the only bar to plaintiffs' standing in this case were, as the majority suggests, the technical requirement that they intervene pursuant to Federal Rule of Civil Procedure 24 instead of bringing this lawsuit as an independent action, I agree that the case, under the circumstances presented here, might not warrant reversal.[4] However, "[a]n intervenor cannot step into the shoes of the original party unless the intervenor independently 'fulfills the requirements of Article III.' " *Arizonans,* 117 S.Ct. 1055, 520 U.S. at 64 (internal citation omitted). Nothing in this record supports a conclusion that Wilson and Middlebrooks could do so here.

---

[4]The majority makes reference to *Martin v. Wilks,* 490 U.S. 755, 762-67, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), a Title VII race discrimination case. *Wilks* is not helpful on the issue of plaintiffs' Article III standing to bring an independent action, as it addressed only the issue of mandatory intervention. There was no question in that case as to whether plaintiffs alleged a cognizable injury.

23

Because plaintiffs have failed to allege an injury which satisfies the requirements of Article III, I believe this suit should be dismissed for lack of jurisdiction, and accordingly, I dissent.